CARLTON, Justice.
Appellees entered into a contract providing that Cone’s Dairy would formulate and market in Florida various food products made according to formulae owned and controlled by Quality Food Products, Inc. The Florida Department of Agriculture approved the marketing of some of these products, but opposed the marketing of others on the ground that they qualified as filled milk products prohibited by F.S.. § 502.151, F.S.A.[1] Appellees filed complaint in Circuit Court, Leon County, seeking a Declaratory Decree construing their rights, duties and responsibilities under this statute.
On April 15, Circuit Court, the Honorable Hugh Taylor presiding, rendered a Decree which in effect held that F.S. § 502.151, F.S.A. was unconstitutional. This was followed on May 12, 1969, by Judge Taylor’s Order in which it was:
“ORDERED AND ADJUDGED that the defendants, their agents, officers, servants, and employees are hereby permanently restrained and enjoined from prohibiting or interfering with the plaintiffs, their agents, officers, servants, employees, licensees and privies from manufacturing, selling, offering for sale or marketing plaintiffs’ products within the State of Florida, or marketing plaintiffs’ products within the State of Florida in such containers as have been previously approved for use by the defendants.”
Appellants Doyle Conner, Commissioner of Agriculture, and that Department of our *494 State government, entered a direct appeal in this Court. We affirm, with qualification, the decision rendered below.
This case is a sequel to Setzer v. Mayo, 150 Fla. 734, 9 So.2d 280 (1942), in which this Court upheld the constitutionality of this statute by vote of four to three. In Setzer, a food store operator selling “Mil-nut” was charged with, and convicted of, violating Chapter 20496, Laws of Florida 1941, which defined and prohibited the manufacture, possession and sale of filled milk.
The term “filled milk” meant then, as it does under the current statute, “[A]ny milk, cream, or skimmed milk, whether or not condensed, evaporated, concentrated, powdered, dried, or desiccated, to which has been added, or which has been blended or compounded with, any fat or oil other than milk fat, whether in bulk or in containers, hermetically sealed or unsealed.” (Emphasis supplied.) Chapter 20496, § 2, declared: “That ‘filled milk’ as herein defined, is an adulterated article of food, injurious to the public health, and its sale constitutes a fraud upon the public.”
Experimentation with food substitutes spurred on by World War I revealed that vegetable fats could be substituted for milk fat (commonly known as butter fat) in milk, and that the resulting milk would be more economical yet still quite palatable. The vegetable fat most commonly utilized was coconut oil, and the end product, which contained all other natural ingredients of milk, was “filled milk.” This substitution was much opposed by dairy interests and the scientific community. Milk fat was considered to be a very important food element in milk, rich in vitamins and other nutritious matter. Coconut oil lacked this status and it was demonstrated that the use of filled milk as a substitute for pure milk resulted in undernourishment and malnutrition and diseases incident thereto. Accordingly, the Legislatures of numerous states prohibited or severely regulated the sale of filled milk. In 1938 the United States Supreme Court, in United States v. Carolene Products Co., 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234, upheld the constitutionality of a federal ban on interstate shipment of filled milk. The- Court placed great reliance upon the fact that milk fat substitutes weakened the quality of milk as a food source, and that because of the identical taste and appearance of filled and pure milk, people could be sold or served one for the other without being aware of the difference, thus opening an avenue for fraud. The product specifically involved in the Cwolene case was “Milnut”.
In 1941 the Florida Legislature followed the lead of other states and enacted Chapter 20496, which prohibited filled milk with certain exceptions, and which declared it to be an injurious adulteration, the sale of which constituted fraud. Mr. Set-zer, a Jacksonville food store operator selling “Milnut”, was convicted of violating Chapter 20496, and he appealed here. We recognized in the Setzer case, supra, that the Legislature had the power to prescribe a standard for dairy products in the interest of public health and the general welfare and that filled milk was generally considered to be injurious to health. We also recognized, however, that the Legislature’s power in this regard was not absolute. Any prohibition under the police power must have some relation to the protection of the health, morals, safety or welfare of the public, and if no relation can be shown which is reasonable, then such prohibition must be taken as arbitrary and capricious, the effect of which is to deprive one of property without due process, or to deprive one of equal, protection under law.
Thus we said in Setzer that if it could be shown that a substitute for milk fat rendered milk no less wholesome and useful, then the reason for prohibition would be dissipated and “Milnut” could not be prohibited even though classed as filled milk. Regarding this point, Justice Terrell, writ *495 ing for the majority, said, 150 Fla. 740, 741, 9 So.2d 282, 283:
“The statute in question proscribes all fats and oils but milk fat as a substitute for butter fat. And while we uphold the validity of the Act, we are conscious of the rule that a valid statute may be assailed by proof of facts showing that as applied to a particular article, it is without support in reason because the article, although within the proscribed class, is so different from others in the same class as to be without the reason for the prohibition, the effect of the proof depending on the circumstances, of the case. United States v. Carolene Products Co., supra, and cases cited.
“This opinion is planted squarely on the doctrine of the last cited case and the case of Carolene Products Co. v. Wallace et al., D.C., 27 F.Supp. 110, affirmed without opinion in 308 U.S. 506, 60 S.Ct. 113, 84 L.Ed. 433, and as we interpret these cases, it is not sufficient to prove that cotton seed oil and other substitutes for butter fat are wholesome and nutritious, if it is shown that in addition to being wholesome and nutritious, they are rich in vitamins that are equal to or superior to those found in butter fat and will perform the same function as food elements, they should be classed in the same category and not banned by the Act. If, however, there is a well founded division of opinion, the judgment of the legislature will not be overthrown; the fact that an article is pure and not injurious is not material in a judicial inquiry. The question here does not challenge the purity and wholesomeness of filled milk. It merely bans it as a substitute for pure milk.
“In fine, food value and the place of vitamins in the food is a subject that is still open for added knowledge. Well recognized food concepts of yesterday are being discarded because of scientific discovery. If therefore relators can show that notwithstanding their product is pro-
duced by substituting cotton seed oil or some other substitute for butter fat and vitamins it is wholesome and nutritious and that it is equal to or superior to whole milk as a food, the test prescribed in the last two cited cases is met and their product relieved from condemnation by the Act.”
Our final holding in Setzer was that while the filled milk prohibition itself was constitutional, the trial judge had erred in not allowing the defendants opportunity to submit evidence whether or not “Milnut” was equal to, or superior to, pure milk since “Milnut” as sold in Florida contained cotton seed oil, not coconut oil, as the milk fat substitute. If this could be demonstrated, then the product could not be prohibited since it would be neither injurious nor fraudulent.
Three members of the Setzer panel dissented. They were of the view that “Mil-nut” had already been shown to meet the above test. They also held the view that filled milk generally, where properly regulated, was wholesome, nutritious and marketed free of fraud, and that the Legislature could not prohibit its sale merely because it was a substitute for milk containing milk fat.
In 1967 the Legislature revised and amended statutory Chapter 502, relating to milk and milk products. The filled milk prohibition initially enacted as Chapter 20496, and carried through to 1967, appeared in the revised Chapter as F.S. § 502.-151, F.S.A. The Legislature again specifically declared that “ ‘Filled milk’ as herein defined, is an adulterated article of food, injurious to the public health, and its sale constitutes a fraud upon the public.”
Concurrently, and crucial to this decision, the Legislature enacted for the first time F.S. § 502.161, F.S.A., entitled “Imitation Milk”. This statute approved possession, manufacture and sale, by implication, of any synthetic food product “which has the semblance of milk or milk product or which has in its name the word ‘milk’ *496 or the name of a milk product but which does not come within the definition of milk, a milk product or filled milk.” Section 2 of the statute provided that the synthetic milk or milk product had to be labeled with the word “ ‘imitation’ immediately preceding the word milk or the common or usual name of the milk product which it imitates.”
Subsequently, appellees entered into their contract for formulation and sale of the products set out at the beginning of this opinion. The only product which they actually marketed was “Fortified Imitation Milk” sold under the “Farmer's Daughter” label. The Florida Department of Agriculture approved marketing of some of appellees’ products, but prohibited marketing of others, including “Fortified Imitation Milk,” because they qualified as filled milks. Appellees tested the prohibitions in Circuit Court by seeking Declaratory Decree.
Appellants presented several arguments supporting prohibition in Circuit Court. First, fluid milk was a substantial food in itself which was essential for good nutrition, and which formed a considerable part of the diet of many, particularly the young and the sick and the infirm. Second, fats used as substitutes for milk fat, especially coconut oils, fall short of being nutritional equivalents of milk. Milk is naturally produced only as a food source for newborn animals and infants. Because of this, milk fat has certain unique characteristics as a food source not duplicated by any other fat, and certainly not by any vegetable fats. While substituted fats may appear to chemically resemble milk fat, they cannot biologically duplicate milk fat, and therefore, substituted fats can never be equal in biological value. In this sense, substitution of other fats is injurious to health.
The third point advanced by appellants goes to the fraud question. They contend that filled milk is particularly pernicious because it is not easily differentiated from pure milk. It is suggested that people out shopping for groceries pay little attention to labels, and when they reach the dairy case, their attention focuses on price alone. Anything in a familiar milk carton that has the lowest price is selected. Since filled milk would presumably be cheaper, many would inadvertently select a filled milk rather than pure milk. When the carton was opened at home, the fluid contents would appear to be pure milk because all that would have been altered would be the fat content. If the shopper liked the taste, then he would likely buy filled milk again since a price differential would presumably exist.
Because substitute fats are inadequate compared to milk fats, the shopper would be, in effect, defrauded. What is worse, the indigent and the elderly, having limited funds, would find themselves economically coerced into buying filled milk, and these would be the people who would most need the nutrients provided by milk fat. Appellants contend that these were the considerations which prompted the Legislature to specifically declare the sale of filled milk to be a fraud.
Finally, appellants suggested that a reasonable basis existed for prohibiting filled milk while allowing sale of imitation milk because the two products were totally unrelated. Filled milk involved alteration of a natural food, whereas imitation milk was simply something entirely different and no more related to pure milk than a soft drink.
Appellees gave these arguments in opposition to prohibition. First, as the three dissenting members of the Setzer panel observed, filled milk is wholesome, nutritious and useful as a food source. The statutes recognize that the only difference between it and pure milk is that milk fat has been removed and vegetable fat has been substituted for it. Pure milk is obviously not injurious; therefore, if adding a substitute for milk fat to milk renders it adulterated, injurious and a fraud, it must be the substitute itself which is essentially injurious.
*497 Yet this cannot be, since the Legislature approved substitution of vegetable fat for milk fat in oleomargarine before it enacted the filled milk prohibition. See Mayo v. Winn & Lovett Grocery Co., 155 Fla. 318, 19 So.2d 867 (1944). Also, it had already approved the sale of filled cheese in which milk fats were replaced with vegetable fats. See Comp.Gen.Laws Supp.1936, § 3219(5) and (6). Furthermore, the initial filled milk prohibition as well as the one in effect today specified that as long as no butter fat was extracted, vegetable fats could be added to milk and milk products designed and sold for the purpose of feeding children and the sick and the infirm. Certainly, if vegetable fat was injurious, it would not be permitted in filled cheese, oleomargarine, and milk especially prepared for children and the sick and the infirm, and numerous other food products.
Appellees also pointed out that the Legislature approved the sale of milk and milk products from which almost all milk fat has been extracted; for example, skimmed milk, which is simply milk from which almost all milk fat has been removed, and buttermilk, which is the residue remaining after the milk fat has been churned out of pure milk. Clearly the Legislature recognizes that removal of milk fat does not render milk injurious, nor its sale fraudulent.
Second, appellees maintained that their products utilized soybean oil, which is recognized the world over as a food source, and which does not share greatly in coconut oil’s deficiencies. Appellees contended that this Court recognized this in Setzer that it was the use of coconut oil which initially lead to passage of filled milk prohibitions in various states, and that this Court held that a filled milk could not be condemned if it were equal to milk in food value.
Third, appellees contended below that there exists a substantial portion of the populace that intentionally desires to buy milk without milk fat. These people purchase, of their own free will, skimmed milk, low fat milk, buttermilk and even dry powdered milk, and no logical reason exists for depriving them of milk containing substitutes for milk fat, if they desire to buy it. The Legislature specifically recognized, when it passed the Imitation Milk statute, that some people may not even want to buy any part of natural milk, although they may nonetheless wish to purchase a milk imitation.
Fourth, appellees submitted below that filled milk, just like all other foods and milk products, must be properly labeled and must satisfy numerous other statutory safeguards, including inspection and quality control. Appellees contended that it is absurd to suggest that filled milk should be prohibited because people who are shopping reach for milk cartons without reading the label which identifies the contents. If this were true, how could the Legislature approve marketing of imitation milk? Wouldn’t shoppers be equally inadvertent in the case of imitation milk? The fact of the matter is, as a general proposition, people see what they want and they buy it. Filled milk, just like imitation milk and all other dairy and nondairy products, must be properly labeled so that the consumer will not be confused.
Appellees’ fifth and final argument presented below was that by passage of the Imitation Milk Statute, the Legislature erased any reasonable basis for upholding the constitutionality of the filled milk prohibition. Any prohibition under the police power must have some relation to the protection of the health, morals, safety or welfare of the public in order that it be constitutional. In passing the filled milk prohibition, the Legislature sought to prohibit the selling of any substitute for pure milk, and it specifically declared that sale of any substitute would constitute a fraud. By legalizing sale of imitation milk, the Legislature recognized advances made in our knowledge of food values and nutrition, and it chose to recede from a policy of prohibiting substitutions for milk. Having done this, it cannot reasonably condone sale *498 of imitation milk which by definition contains no milk constituents, yet condemn filled milk which contains all milk constituents except for milk fat.
The arguments given below by the litigants were repeated in this Court. We find ourselves persuaded by the appellees. Especially cogent is the last argument.
We recognize the Legislature’s power to regulate the sale of dairy products in the interest of health and welfare. We can certainly appreciate the factors which lead to enactment of the filled milk prohibition in 1941. But we are also aware of the settled principle of constitutional law that a statute which depends upon the existence of a certain state of facts for its validity may cease to be constitutionally valid when that certain set of facts ceases to exist. Chastleton Corp. v. Sinclair, 264 U.S. 543, 44 S.Ct. 405, 68 L.Ed. 841 (1924). Chapter 20496 was valid because the Legislature determined, given the state of the art at the time, that filled milk was injurious because it was a substitute for milk and because its similarity to milk would open avenues for fraud.
But once the Legislature decided in 1967 that imitation milk could be sold as a milk substitute so long as it was labeled “imitation milk”, this removed the constitutional props out from under the filled milk prohibition. We cannot accept as reasonable a situation where one statute condemns a milk product primarily composed of milk constituents with only milk fat removed, while another endorses sale of “[A]ny food product which has the semblance of milk or which has in its name the word ‘milk’ * * * ” so long as it does not contain any of the natural constituents of milk. Appellants’ witnesses, experts in nutrition, admitted that filled milk was much more desirable from the standpoint of nutrition and digestibility than any imitation milk.
We quote with approval from Judge Taylor’s decree:
“The court is of the opinion that when the legislature by enacting Section 502.-161 expressly recognized the right to make and sell imitation milk it withdrew any statutory prohibition against the misleading of the public by the making of a substance having the appearance and superficial characteristics of milk and invited efforts on the part of dealers to produce and market imitation milk. By requiring imitation milk to be labeled as such it specified the protection which it determined the people needed from being mislead into thinking they were getting real milk.
“The court has not ignored the great volume of expert testimony offered by the defendant. It may be, as some believe, that vegetable fats, particularly coconut oil, lack some nutritive qualities found in butter fact and a diet in which such fats are used extensively may not be desirable. Many other variations from a perfect diet may affect health in varying degrees. This judgment is not to be construed as limiting the reasonable exercise of the legislative power to avoid the public being mislead.
“What the court does hold is that so long as the manufacturer (sic) of imitation milk is expressly legalized, it is unreasonable, arbitrary and capricious to declare that such imitation cannot be made by the use of some part of real milk when the use of this part of real milk makes the imitation more nutricious (sic) and healthy (sic) and, as an imitation, is properly labeled as such.”
The judgment appealed from is affirmed.
It is so ordered.
ROBERTS, Acting C. J., and DREW, THORNAL, ADKINS and BOYD, JJ., concur.

. These products were approved: Imitation All Purpose Creme, Fifty-Fifty, Bleu Cheese Dip, French Onion Dip, Italian Garlic Dip, and Smokey Horseradish Dip; these were disapproved: Fortified Imitation Milk, Choc-O-Melk, Holiday Nog, Sour Kreme, and Imitation Ice Krim. Fortified Imitation Milk was tlie only product actually marketed prior to institution of this litigation.