403 So.2d 365 (1981)
Rene PINILLOS, As Personal Representative for the Estate of Margarita Pinillos, Deceased, Surviving Spouse; Vanessa Margarita Pinillos, Surviving Child and the Estate of Margarita Pinillos, Appellants/Cross-Appellees,
v.
CEDARS OF LEBANON HOSPITAL CORPORATION and the Florida Patients Compensation Fund, Appellees/Cross-Appellants.
No. 59021.
Supreme Court of Florida.
June 18, 1981.
Rehearing Denied September 29, 1981.
*366 Edward A. Perse of Horton, Perse & Ginsberg, and Ratiner & Glinn, Miami, for appellants/cross-appellees.
Mel Lamelas of Lanza, Sevier & Womack, Coral Gables, for appellees/cross-appellants.
ALDERMAN, Justice.
The final judgment in this medical malpractice wrongful death action is before us on direct appeal because the trial court held section 768.50, Florida Statutes (1979) (Collateral Sources of Indemnity), to be unconstitutional.[1] This section requires that any judgment in a medical malpractice action be reduced by any amounts which the plaintiff has received from collateral sources.
Plaintiffs, the surviving spouse, the child, and the estate of the deceased, appeal the *367 judgment on the basis that the trial court erred in overriding and recomputing the jury's reduction of their damage awards to present value. Defendants, Cedars of Lebanon Hospital and the Florida Patients Compensation Fund, cross appeal the trial court's ruling that section 768.50 is unconstitutional. Finding both claims to be meritorious, we reverse the trial court's judgment on these issues. The Hospital also contends the trial court committed reversible error by denying its motion for a directed verdict. We find no merit in this claim and affirm the trial court's judgment on this issue.
Margarita Pinillos was admitted to Cedars of Lebanon Hospital for the purpose of delivering a child after a full-term pregnancy. Her attending physician performed a nonemergency cesarean section which culminated in Vanessa Pinillos' birth but which also resulted in Margarita's death. Charging the Hospital and several named physicians with medical malpractice, Rene Pinillos, Margarita's surviving spouse, brought this wrongful death action on behalf of himself, his daughter, and his wife's estate. The jury returned verdicts for the plaintiffs against the Hospital and the Florida Patients Compensation Fund.[2] The jury verdict stated the gross amount of future damages for each plaintiff and separately stated the amount of future damages reduced to present money value. The reduction was calculated pursuant to an erroneous formula given by the judge in his instructions to the jury.[3]
At a post-trial hearing, the court took evidence on what benefits were received by plaintiffs from collateral sources, but then, on motion of the plaintiffs, it held section 768.50 unconstitutional and refused to set off any collateral source benefits against the amounts of damages assessed by the jury.
The primary question is whether section 768.50 violates the equal protection clauses of the Florida and federal constitutions. The plaintiffs argue that the distinction drawn between medical practitioners and other members of the public is arbitrary and unreasonable. Since no suspect class or fundamental right expressly or impliedly protected by the constitution is implicated by section 768.50, we find that the rational basis test rather than the strict scrutiny test should be employed in evaluating this statute against plaintiffs' equal protection challenge. The rational basis test requires that a statute bear a reasonable relationship to a legitimate state interest, and the burden is on the challenger to prove that a statute does not rest on any reasonable basis or that it is arbitrary. In re Estate of Greenberg, 390 So.2d 40 (Fla. 1980).
The legislature, in the preamble to the Medical Malpractice Reform Act, of which section 768.50 is a part, announced in detail the legitimate state interests involved in its enactment of this provision. The legislature determined that there was a professional liability insurance crisis in Florida. It found that professional liability insurance premiums were rising at a dramatic and exorbitant rate, that insurance companies were withdrawing from this type of insurance market making such insurance unavailable in the private sector, that the costs of medical specialists were extremely high, and that a certain amount of premium costs is passed on to the consuming public through higher costs for health care services. This insurance crisis, the legislature concluded, threatened the public health in Florida in that physicians were becoming increasingly wary of high-risk procedures and, accordingly, were downgrading their specialties to obtain relief from oppressive insurance rates and in that the number of available physicians in Florida was being *368 diminished. The legislature expressed the concern that the tort law liability insurance system for medical malpractice would eventually break down and that the costs would continue to rise above acceptable levels.
The plaintiffs have failed to show that there is no rational basis for the distinction drawn by this statute for health care providers of professional services. We hold that the classification created by section 768.50 bears a reasonable relationship to the legitimate state interest of protecting the public health by ensuring the availability of adequate medical care for the citizens of this state.[4]Carter v. Sparkman, 335 So.2d 802 (Fla. 1976).
We have also considered plaintiffs' challenges to this statute on the bases that it violates their right to access to the courts guaranteed by article I, section 21, Florida Constitution, and that it violates article II, section 3, Florida Constitution, and article V, section 2(a), in that it invades this Court's rulemaking power. We find these claims to be without merit. Accordingly, we hold that section 768.50 is constitutional, and we reverse the trial judge's ruling on this point.
We next address the issue raised by plaintiffs as to whether the trial court erred in basing its final judgment on expert testimony presented by defendants at a post-trial hearing rather than rendering judgment in accordance with the jury verdict or granting a new trial on the issue of damages only. At the post-trial hearing, the Hospital contended that the jury had employed an incorrect formula to arrive at the present money value of future damages stated in its verdict form. It was permitted to call an actuary as an expert witness who testified as to the proper reduction to present money value of the gross amounts found by the jury. The court accepted this testimony and entered judgment reflecting the figures testified to by the actuary rather than the erroneous present money value reductions made by the jury.
Although the parties could have stipulated that the judge do the reductions after the jury returned its verdict, the record does not reveal any such stipulation here. The plaintiffs expressly requested that the jury make the appropriate reductions and only agreed to the judge's checking of the jury's arithmetic. They did not agree to the use of a formula to which the jury was given no access and did not agree to the judge's reduction of the gross verdict amounts contrary to section 768.48. Since the defendants failed to produce any evidence at trial on the method of reducing the future damages to present value, since it is conceded that the judge erroneously instructed the jury on the method of reduction, and since the jury, following the judge's erroneous instruction, incorrectly calculated its reductions, we hold that the trial court erred in making the reductions predicated upon a formula established post trial. Rather, upon motion of counsel, it should have granted a new trial on damages.
Lastly, the Hospital argues that the trial court erred in denying its motion for a directed verdict on its vicarious liability for the alleged negligence of Dr. Haroldo Diaz. It contends that the evidence established that Dr. Diaz was neither an employee nor an agent of the Hospital. Plaintiffs respond that the jury could reasonably infer from the facts of this case that Dr. Diaz was the Hospital's agent.
The evidence did not clearly establish whether Dr. Diaz was or was not an employee or agent of the Hospital's. There was evidence to support either view. That *369 being the case, the issue was properly submitted to the jury to make its factual determination. We, therefore, affirm the trial court's denial of this motion.
Accordingly, the order of the trial court is affirmed in part and reversed in part, and this case is remanded for further proceedings.
It is so ordered.
OVERTON, ENGLAND and McDONALD, JJ., concur.
SUNDBERG, C.J., dissents with an opinion in which ADKINS and BOYD, JJ., concur.
SUNDBERG, Chief Justice, dissenting.
If saying so could make it so, unquestioning acceptance of the legislative findings that a medical malpractice crisis did and does exist in Florida would be understandable, if not warranted. But this Court, in making its determination of constitutionality, is not bound by whatever preamble the legislature decides to attach to justify a statute:
Legislative findings and declarations of policy are presumed to be correct but are not binding upon the courts under all conditions... . "The general rule is that findings of fact made by the legislature are presumptively correct. However, it is well recognized that the findings of fact made by the legislature must actually be findings of fact. They are not entitled to the presumption of correctness if they are nothing more than recitations amounting only to conclusions and they are always subject to judicial inquiry." (Emphasis added.)
Moore v. Thompson, 126 So.2d 543, 549 (Fla. 1960) (quoting from Seagram-Distillers Corp. v. Ben Greene, Inc., 54 So.2d 235, 236 (Fla. 1951)). This Court's inquiry must be to determine whether such a crisis is extant, because even though the statute in question may have been valid when enacted, changes in conditions to which it applies may make a statute invalid. See Georgia Southern & Florida Railway v. Seven-Up Bottling Co., 175 So.2d 39, 40 (Fla. 1965). When the factual basis of a statute is undermined by changing circumstances, the statute may not be considered automatically valid even though once valid. See Conner v. Cone, 235 So.2d 492, 498 (Fla. 1970). Our duty to the citizens of this state is to scrutinize, not accommodate.
Section 768.50, Florida Statutes (1979),[1] essentially abolishes the collateral source *370 rule, but only with reference to the medical profession. This common law rule typically prevents reductions of the plaintiff's tort recovery by any amounts of alternative compensation received from sources such as health insurance or disability benefits. The justifications for the rule are (1) to avoid penalizing the plaintiff who purchases insurance, (2) to avoid discouraging the purchase of insurance, and (3) to increase the deterrent effect of liability. The validity of these rationales has been debated, but commentators agree that if the collateral source rule is modified, there is no justification for confining changes to medical malpractice cases. See Abraham, Medical Malpractice Reform: A Preliminary Analysis, 36 Md.L. Rev. 489, 504-6 (1977); Comment, An Analysis of State Legislative Responses to the Medical Malpractice Crisis, 1975 Duke L.J. 1417, 1447-50. By the section in question, the legislature has chosen the medical profession alone upon which to confer the benefits of decreased liability. We must assess if such special treatment is justifiably bestowed.
Of the six cases from all jurisdictions which have dealt directly with equal protection challenges to abrogation of the collateral source rule in medical malpractice cases, three have agreed with the commentators and found the statutes invalid. The most recent of these cases applied the minimum scrutiny, rational relationship standard of McGowan v. Maryland, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961), but nevertheless found abrogation of the collateral source rule for the medical profession violative of equal protection. In that case, Carson v. Maurer, 424 A.2d 825 (N.H., 1980), the New Hampshire Supreme Court noted that such an abrogation could lead to the anomalous result of an injured party's insurance company alone being required to compensate the victim even though the negligent physician was fully insured. Furthermore, since the patient has paid for his collateral benefits, often through wage concessions, the statute merely provided the tortfeasor's insurance company with a windfall at the victim's expense.
A second case to hold such a statute invalid applied a somewhat modified rational basis test, as set out in Reed v. Reed, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971): "A classification `must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'" See Arneson v. Olson, 270 N.W.2d 125 (N.D. 1978).[2] This "means-oriented scrutiny"[3] focuses on the relationship between the means and ends of the legislation, and examines the factual underpinnings of this connection. This slightly higher standard for equal protection review has often been employed by this Court. See, e.g., State v. Lee, 356 So.2d 276 (Fla. 1978); Soverino v. State, 356 So.2d 269 (Fla. 1978); In re Reed's Estate, 354 So.2d 864 (Fla. 1978). I believe that especially under this elevated standard the Court cannot possibly uphold the statute without a closer examination of whether a medical malpractice insurance crisis exists. But even under the bare rational relationship test which (I believe) the majority proposes, we are remiss in simply accepting legislative findings without question, because if no crisis exists, no statute could *371 rationally relate to its alleviation as justification for special treatment of the medical malpractice case.
Unfortunately, the record does not come to us with sufficient information for us to fairly determine whether such a crisis exists. The trial judge took judicial notice of evidence negating a crisis, evidence which was presented in a prior unrelated case, but this is not properly part of the record. See Atlas Land Corp. v. Norman, 116 Fla. 800, 156 So. 885 (1934). This Court is left in a vacuum as the courts in Jones v. State Board of Medicine, 97 Idaho 859, 555 P.2d 399 (1976), cert. denied, 431 U.S. 914, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977), and Oregon Medical Association v. Rawls, 276 Or. 1101, 557 P.2d 664 (1976), who were faced with an identical problem and were forced to remand for extensive findings of fact concerning the reality of a medical malpractice crisis.[4] I believe we should follow the same course, and shoulder our obligation to carefully scrutinize this challenged legislation for its constitutionality. Patently, even a rational relationship standard cannot be met if a crisis does not in fact currently exist. I would therefore remand this cause to the trial court for detailed findings of fact to determine the existence vel non of a medical malpractice crisis.
I am not unmindful of our earlier implicit (if not express) acceptance of the legislative finding of a health care crisis resulting from escalating medical malpractice insurance premiums. Carter v. Sparkman, 335 So.2d 802, 805-06 (Fla. 1976), cert. denied, 429 U.S. 1041, 97 S.Ct. 740, 50 L.Ed.2d 753 (1977). However, the Carter decision is not controlling in the instant case for two reasons.[5] First, the Court in Carter simply accepted the legislative findings contained in Chapter 75-9, Laws of Florida, without any real scrutiny of the underlying factual basis for the findings. Furthermore, later events have cast doubt upon the veracity of those findings.[6] One cannot help but question the assertion that a "crisis," which by its terms connotes a critical turning point of an ordeal, has been continuing for six years. Second, the state of affairs found by the legislature to exist in 1975 is of dubious relevancy in 1981, particularly in view of underwriting experience in the medical malpractice insurance field which has been made public since 1975. Hence, a remand to the trial court for proper findings on this critical issue is imperative before a reasoned judgment can be made in this case.
ADKINS and BOYD, JJ., concur.
NOTES
[1] This appeal was filed first in the Third District Court of Appeal and then transferred to this Court. We have jurisdiction under article V, section 3(b)(1), Florida Constitution (1972).
[2] Prior to trial, plaintiffs settled with Glover and Glover and Associates, P.A., and they were voluntarily dismissed. Also, a motion to sever filed by Dr. Diaz, the anesthesiologist who allegedly deviated from the standard of care in the administration of anesthesia to Margarita Pinillos during the cesarean section, was granted.
[3] The record does not reflect the source of this erroneous instruction.
[4] Courts which have found abolition of the collateral source rule unconstitutional have used tests other than the reasonable relationship test. In Arneson v. Olson, 270 N.W.2d 125, 133 (N.D. 1978), the court used a test requiring a "close correspondence between statutory classification and legislative goals," a test it distinguished from the reasonable relationship standard and the strict scrutiny standard. In Graley v. Satayatham, 343 N.E.2d 832, 836 (C.P. Cuyahoga County 1976), the court struck down the Ohio statute abolishing the collateral source rule in medical malpractice cases because no showing of a "compelling governmental interest" was made.
[1] Section 768.50 reads in pertinent part:

(1) In any action for damages for personal injury or wrongful death, whether in tort or in contract, arising out of the rendition of professional services by a health care provider in which liability is admitted or is determined by the trier of fact and damages are awarded to compensate the claimant for losses sustained, the court shall reduce the amount of such award by the total of all amounts paid to the claimant from all collateral sources which are available to him; however, there shall be no reduction for collateral sources for which a subrogation right exists... .
(2) For purposes of this section:
(a) "Collateral sources" means any payments made to the claimant, or on his behalf, by or pursuant to:
1. The United States Social Security Act; any federal, state, or local income disability act; or any other public programs providing medical expenses, disability payments, or other similar benefits.
2. Any health, sickness, or income disability insurance; automobile accident insurance that provides health benefits or income disability coverage; and any other similar insurance benefits, except life insurance benefits available to the claimant, whether purchased by him or provided by others.
3. Any contract or agreement of any group, organization, partnership, or corporation to provide, pay for, or reimburse the costs of hospital, medical, dental, or other health care services.
4. Any contractual or voluntary wage continuation plan provided by employers or any other system intended to provide wages during a period of disability.
....
(4) Unless otherwise expressly provided by law, no insurer or any other party providing collateral source benefits as defined in subsection (2) shall be entitled to recover the amounts of any such benefits from the defendant or any other person or entity, and no right of subrogation or assignment of rights of recovery shall exist. All policies of insurance providing benefits described in this section shall be construed in accordance with this section after the effective date of this act.
[2] The third case to strike down abrogation of the collateral source rule was Graley v. Satayatham, 74 Ohio Op.2d 316, 343 N.E.2d 832 (C.P. 1976), but this case applied the inappropriate standard of "compelling governmental interest." Three cases have upheld similar statutes against equal protection challenges, all applying a reasonable relationship standard. Eastin v. Broomfield, 116 Ariz. 576, 570 P.2d 744 (1977); Rudolph v. Iowa Methodist Medical Center, 293 N.W.2d 550 (Iowa 1980); Prendergast v. Nelson, 199 Neb. 97, 256 N.W.2d 657 (1977). Rudolph relied upon and followed Eastin. Prendergast did not directly address the issue of abrogation of the collateral source rule, but upheld such an abrogation by implication when it upheld the entire Nebraska medical liability act.
[3] Gunther, The Supreme Court, 1971 Term  Foreward: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1, 20-24 (1972).
[4] One commentator in this state has claimed that the "crisis" was a creation of insurance interests, and that no actual threat of breakdown in health services delivery ever existed. Cunningham & Lane, Malpractice  The Illusory Crisis, 54 Fla.Bar J. 114 (1980).
[5] Carter v. Sparkman, 335 So.2d 802 (Fla. 1976), is also today of little practical importance after our decision in Aldana v. Holub, 381 So.2d 231 (Fla. 1980), which diminished the stature of Carter quite considerably.
[6] Cunningham & Lane, supra note 4.