786 So.2d 521 (2001)
Marshall MITCHELL, Petitioner,
v.
Michael W. MOORE, Respondent.
No. SC95299.
Supreme Court of Florida.
April 12, 2001.
Rehearing Denied May 16, 2001.
*523 Susan L. Kelsey of Holland & Knight LLP, Tallahassee, FL, for Petitioner.
Robert A. Butterworth, Attorney General, and Douglas T. Squire and Charlie McCoy, Assistant Attorneys General, Tallahassee, FL, for Respondent.
PER CURIAM.
Marshall Mitchell petitions this Court for writ of mandamus. We have jurisdiction. Art. V, § 3(b)(8), Fla. Const.
While we recently struck down the copy requirement portion of section 57.085, Florida Statutes (1999) (hereinafter the Prisoner Indigency Statute), in Jackson v. Florida Dep't of Corrections, 26 Fla. L. Weekly S51, ___ So.2d ___, 2000 WL 33114471 (Fla. May 4, 2000), we find it necessary to further address the copy requirement due to the importance of the constitutional issue raised in this case.

FACTS
On July 24, 1996, petitioner, an inmate in Florida's prison system, filed a petition for writ of habeas corpus in the Leon County Circuit Court. The circuit court treated the petition as one for a writ of mandamus and denied the petition.[1] On *524 September 2, 1997, petitioner filed his notice of appeal in the circuit court and it was forwarded to the First District Court of Appeal on September 4, 1997. On September 10, 1997, the First District issued an order instructing petitioner to pay the filing fee of $250 or obtain an order determining him indigent (for appellate purposes) from the lower court within thirty days. On September 22, 1997, petitioner filed an affidavit of insolvency in the trial court. However, before the circuit court had ruled upon petitioner's request for indigency, on November 4, 1997, the First District dismissed petitioner's appeal. On November 12, 1997, the circuit court denied petitioner's request for indigency because he had failed to submit copies of the complaints or other initial pleadings he had filed in the preceding five years as required by subsection (7) of the Prisoner Indigency Statute. It seems clear from petitioner's numerous motions that petitioner thought that all the courts wanted was information concerning his lack of funds. Therefore, on November 12, 1997, (the same day the circuit court denied his request to proceed in forma pauperis) petitioner filed a response to the First District's dismissal order detailing the cases in which he had been adjudicated indigent, attaching a number of orders from various courts finding him indigent and asserting that his financial circumstances had not changed. He also filed a motion for rehearing in the circuit court. The First District denied petitioner's motion for rehearing/reinstatement in December 1997 and the trial court denied his motion for rehearing in February 1998.
At about that time, it seems clear that petitioner began to understand what the courts had wanted (copies of the initial pleadings and final orders, not the orders on indigency). Nevertheless, he also realized that he no longer had copies of the pleadings from the vast majority of the forty or so lawsuits he had filed in the last five years. Petitioner was eventually able to reassemble his old cases and on February 15, 1999, he filed a second motion for reinstatement in the First District explaining that he did not have the copies before that time and that he had mistakenly thought that the courts only wanted prior orders from other courts finding him indigent. On March 19, 1999, the First District denied petitioner's second motion for reinstatement. On April 8, 1999, petitioner filed his petition for writ of mandamus in this Court and was granted indigency status.[2]
Petitioner alleged that the copy requirement of the Prisoner Indigency Statute violated the constitution under various theories. We decline to discuss any but the access to courts theory.

ACCESS TO COURTS
Petitioner argues that the copy requirement of the Prisoner Indigency Statute is unconstitutional because it results in an insurmountable obstacle to a prisoner's right to access the courts.
*525 Having had several years of experience with the Prisoner Indigency Statute, we must now agree. Petitioner's appeal was dismissed for his failure to provide copies of voluminous pleadings which were only obtainable through great difficulty, delay, and public expense. While the copy requirement does not always result in a complete inability to gain access to the courts, it produces procedural pitfalls so difficult and time-consuming that litigation of the merits of a case becomes less time-consuming and frustrating than being permitted to proceed as an indigent. We must conclude that these requirements have become a door to the Court that some inmates simply cannot open.
There are two sources of the right to access the courts. Florida's constitution specifically guarantees a citizen's access to courts. See art. I, § 21, Fla. Const. The Constitution of the United States does not, however, contain a specific clause providing for this right. The United States Supreme Court, nevertheless, has held that there is such a right arising from several constitutional provisions including the First Amendment, the Due Process Clause, and the Equal Protection Clause. See generally Bounds v. Smith, 430 U.S. 817, 825, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977) (holding that prisoners have a fundamental constitutional right to "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts"), modified, Lewis v. Casey, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). The Supreme Court described the right of "access to courts" as including, among other things, the provision of an acceptable law library. Id. at 828, 97 S.Ct. 1491. In Lewis v. Casey, 518 U.S. at 355, 116 S.Ct. 2174, however, the Court made clear that "access to courts" does not guarantee inmates the right to "transform themselves into litigating engines capable of filing everything from shareholder derivative actions to slip-and-fall claims." States must only provide a reasonably adequate opportunity to file nonfrivolous legal claims challenging their convictions or conditions of confinement. Id.
As pointed out by petitioner's counsel, one problem with Florida's Prisoner Indigency Statute is that the requirement that some inmates comply with the more rigorous copy requirement does not stem from a determination by any court that the inmate has ever filed a frivolous or other improper action. Only inmates who have twice in the preceding three years been permitted to file actions without prepayment of filing fees must comply with these more rigorous requirements. Having filed only two prior actions in forma pauperis is clearly not, in itself, inherently improper. Furthermore, the federal statute upon which the Prisoner Indigency Statute is purportedly fashioned and upon which the State relies to assert that the Florida statute does not amount to an access to courts violation does not contain a copy requirement at all. See 28 U.S.C. § 1915 (Supp. IV 1999). Further, the federal "three strikes" provision to which the State compares Florida's copy requirement only applies when an inmate has been found by a court to have filed three prior in forma pauperis proceedings which were improper.[3] Therefore, if application of these requirements *526 either intentionally or incidentally results in a sanction being imposed on the inmate, there are several constitutional problems. First, no "bad act" has been identified as the basis for the "punishment." Second, if the requirements act to prevent the filing of actions which have not yet even been reviewed to determine whether they are frivolous or otherwise improper, that effect would result in an access to courts violation under the federal constitution.
The copy requirement of Florida's Prisoner Indigency Statute is problematic under an analysis based on Florida's constitution as well. Contrary to the federal constitution, Florida's constitution contains a specific "Access to Courts" provision, found in article I, section 21, that provides:
Access to Courts.The courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay.
In Kluger v. White, 281 So.2d 1 (Fla. 1973), this Court set forth a test for determining compliance with the access to courts clause when the Legislature enacts provisions which appear to restrict the right. In that case, the Legislature purported to do away with a person's ability to sue for an automobile accident unless the property damages exceeded a certain amount. This Court found the statute unconstitutional and established the following test:
[W]here a right of access to the courts for redress for a particular injury has been provided by statutory law predating the adoption of the Declaration of Rights of the Constitution of the State of Florida, or where such right has become a part of the common law of the State pursuant to Fla.Stat. § 2.01, F.S.A., the Legislature is without power to abolish such a right without providing a reasonable alternative to protect the rights of the people of the State to redress for injuries, unless the Legislature can show an overpowering public necessity for the abolishment of such right, and no alternative method of meeting such public necessity can be shown.
Id. at 4. In Kluger, the Court found that the test was not met and declared the statute unconstitutional. On other occasions, however, this Court has concluded that statutes had passed the test because the right of action at issue had been only marginally limited. See, e.g., Chapman v. Dillon, 415 So.2d 12 (Fla.1982) (threshold limits of no-fault statute provide a reasonable alternative to tort action and do not deny access to courts); Purdy v. Gulf Breeze Enterprises, Inc., 403 So.2d 1325 (Fla.1981) (statute requiring reimbursement of insurer for PIP benefits where insured recovers from negligent third party does not deny access to courts); Pinillos v. Cedars of Lebanon Hospital Corp., 403 So.2d 365 (Fla.1981) (admissibility of collateral source evidence in medical malpractice actions upheld); McMillan v. Nelson, 149 Fla. 334, 5 So.2d 867 (1942).
In this case, however, it is not any asserted right to seek redress from the court for any particular injury which has been abolished. Nor is it any asserted right to indigency itself which is at issue. See G.B.B. Investments, Inc. v. Hinterkopf, 343 So.2d 899 (Fla. 3d DCA 1977).[4] *527 On the contrary, the right which has been infringed is the right to seek redress for any type of injury or complaint of any kind in any civil case that requires a filing fee. This type of abolition is far greater than the right taken in Kluger, or any of this Court's previous access to courts cases. Further, in order to find that a right has been violated it is not necessary for the statute to produce a procedural hurdle which is absolutely impossible to surmount, only one which is significantly difficult. This is so because the Florida Constitution provides that "[t]he courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial or delay." Art. I, § 21, Fla. Const. This "openness" and necessity that access be provided "without delay" clearly indicate that a violation occurs if the statute obstructs or infringes that right to any significant degree. We conclude that in petitioner's case, the right was significantly obstructed.
In Kluger, only one type of possible legal action was curtailed. In this case, the right to gain access to the courts itself has been infringed. Under Kluger, the Legislature may only abolish a right if it has provided a reasonable alternative, it has shown an overpowering public necessity for the abolishment of the right, and there is no alternative method of remedying the problem. Kluger, 281 So.2d at 4. We find nothing in the act indicating that the Legislature was faced with such an problem and that there was no alternative method of remedying it.
The right to access is specifically mentioned in Florida's constitution. See art. I, § 21, Fla. Const. Therefore, it deserves more protection than those rights found only by implication. See Lloyd v. Farkash, 476 So.2d 305, 307 (Fla. 1st DCA 1985) (finding duty to protect access to courts guarantee even greater than when the right is one found by implication from other clauses). The "no alternative method of correcting the problem" method of analysis, discussed above, is reminiscent of the goal-method test used in both substantive due process and equal protection analysis for cases in which a fundamental right is taken. See, e.g., Romer v. Evans, 517 U.S. 620, 631-34, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (equal protection); Hodgson v. Minnesota, 497 U.S. 417, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990) (substantive due process). In the goal-method analysis, if the interest which is being taken is a fundamental interest, or if the classification being challenged is based on a suspect classification (such as race), then the means or method employed by the statute to remedy the asserted problem must meet not only the rational basis test, but also the strict scrutiny test. In the strict scrutiny test, the method for remedying the asserted malady must be strictly tailored to remedy the problem in the most effective way and must not restrict a person's rights any more than absolutely necessary. See Washington v. Glucksberg, 521 U.S. 702, 766, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). Further, in strict scrutiny cases, there must be a compelling *528 governmental interest which the statute purports to accomplish. We believe that this "compelling governmental interest" essentially corresponds to the "overpowering public necessity" language used in Kluger and conclude that there is no relevant difference between the "compelling governmental interest/strict scrutiny" test and the "no alternative method of correcting the problem/overpowering public necessity" test set forth in Kluger. Therefore, utilizing the analysis traditionally used in strict scrutiny review, we conclude that the copy requirement restricts and impedes the filing of many more types of inmate petitions than the types of inmate petitions which were identified by the Legislature to be the malady being targeted. The Legislature specifically identified as the targeted evil only frivolous or malicious civil actions. See ch. 96-106, preamble, at 92-93, § 2, Laws of Fla. The copy requirement has the potential to restrict the filing of any type of inmate petition requiring a filing fee. In other words, even assuming the statute satisfies the "compelling interest/overpowering public necessity" prong, the legislation is not strictly tailored (i.e., it is overbroad). Therefore, it does not meet the strict scrutiny or "no alternative method of correcting the problem" test set forth in Kluger.
In a number of cases in which legislative acts were challenged on the ground that a right of recovery had been taken or restricted, this Court held that since a commensurate benefit had been provided as an alternative to the preexisting right, there was no access to courts violation. For example, in Eller v. Shova, 630 So.2d 537 (Fla.1993), this Court found that the system of workers' compensation that provided no-fault recovery was a reasonable alternative to the right to sue one's employer for a work-related injury. Id. at 542-43. In Lasky v. State Farm Insurance Co., 296 So.2d 9 (Fla.1974), the provision of Florida's No Fault Law that denied a plaintiff the right to sue unless certain threshold damages existed was not a violation of access to courts because the right was replaced with the ability to recover uncontested benefits and an exemption from tort liability. Id.; see also Smith v. Department of Insurance, 507 So.2d 1080, 1088 (Fla.1987) (further clarifying the reasoning behind Lasky). In this case, however, there is no commensurate benefit or alternative means for judicial access provided in the statute. Therefore, we conclude that it does not meet this test either.[5]
Statutes which precluded prisoners from filing legal actions like the present statute have been found unconstitutional before. See, e.g., Holman v. Hilton, 712 F.2d 854 (3rd Cir.1983) (finding New Jersey's civil death statute unconstitutional as due process violation); Thompson v. Bond, 421 F.Supp. 878 (W.D.Mo.1976); Delorme v. Pierce Freightlines Co., 353 F.Supp. 258 (D.Or.1973); McCuiston v. Wanicka, 483 So.2d 489 (Fla. 2d DCA 1986); Collins v. Cote, 490 So.2d 164 (Fla. 4th DCA 1986); Lloyd v. Farkash, 476 So.2d 305 (Fla. 1st DCA 1985). Since the procedural hurdles caused by the copy requirement can and in some cases do rise to the level of a denial of access to courts, we have come to the conclusion that it is unconstitutional under Florida's access to courts provision.
Accordingly, we grant the instant petition for writ of mandamus and instruct the First District Court of Appeal to reinstate petitioner's appeal.

*529 APPLICATION OF THIS "NEW RULE"

Whenever a court announces a new rule of law the question arises as to who is subject to or who may take advantage of the new rule. A new rule is applied either prospectively only, prospectively and retrospectively to certain nonfinal cases, or prospectively and retrospectively to all cases, even final cases on collateral review.
Normally, a new rule which is not a fundamental change in the law, but merely an evolutionary refinement is generally applied prospectively to most cases, retrospectively to certain nonfinal cases ("pipeline" cases), but never to final cases.[6] In order for an advantageous decisional change to be fully retroactive to final cases on collateral review, it must be of constitutional nature, a "sweeping change of law" of "fundamental significance" constituting a "jurisprudential upheaval[]." Witt v. State, 387 So.2d 922, 925, 929, 931 (Fla.1980); see State v. Callaway, 658 So.2d 983 (Fla.1995). A mere "evolutionary refinement" will not abridge the finality of judgments because to do so would "destroy the stability of the law, render punishments uncertain and therefore ineffectual, and burden the judicial machinery of our state, fiscally and intellectually, beyond any tolerable limit." Witt, 387 So.2d at 929-30.
This Court has examined at least sixty cases since the Witt decision for purposes of deciding whether the "new rule" was a fundamental constitutional change warranting full retrospective application. In practice, because of the strong concern for decisional finality, this Court rarely finds a change in decisional law to require retroactive application.[7] At least two decisions of this Court found that "new rules" concerning habitual offender sentencing were not fundamental changes. In McCuiston v. State, 534 So.2d 1144 (Fla.1988), for example, this Court declined to retroactively apply Whitehead v. State, 498 So.2d 863 (Fla.1986), which held that finding a defendant to be an habitual offender is not a legally sufficient reason for departure from the guidelines. In State v. Glenn, 558 So.2d 4, 7 (Fla.1990), this Court further clarified that Winters v. State, 522 So.2d 816 (Fla.1988), was merely a refinement of habitual offender caselaw. In Winters, this Court had approved the use of the habitual offender statute to exceed the statutory maximum in accordance with the sentencing guidelines.
On the other hand, in State v. Callaway, 658 So.2d 983 (Fla.1995), this Court provided for certain limited retroactive application *530 in a case addressing an habitual offender issue. In that case, this Court reexamined its decision in Hale v. State, 630 So.2d 521 (Fla.1993), which held that the imposition of consecutive habitual offender sentences was improper. In Callaway, this Court concluded that its decision in Hale was a "fundamental change" in the law. It then balanced the need for decisional finality with the need for fairness and uniformity under the three-step approach of Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), in which a court must consider (i) the purpose to be served by the new rule; (ii) the extent of reliance on the old rule, and (iii) the effect that retroactive application of the rule would have on the administration of justice. In Callaway, this Court focused particular attention on the fact that the habitual offender statute had been amended in 1988 to permit habitual offender sentences to exceed the guidelines. This Court therefore concluded that courts and law enforcement could not have assumed and relied on the belief that defendants could be sentenced consecutively to habitual offender sentences for very many years. Accordingly, requiring that the "new rule" be applied retroactively to provide for a limited two-year window would not unduly prejudice the administration of justice.
Analyzing the instant case, we must first determine whether our decision today was based on analysis of provisions of the constitution. Clearly, our decision in this case is based on both the Florida Constitution and the Constitution of the United States of America. As mentioned above, to determine whether it is of such a fundamental nature as to warrant full retrospective application, we use the three-prong test explained in Stovall. Under Stovall we must consider and balance the purpose to be served by the new rule in our decision, the extent of reliance on the old rule, and the effect that retroactive application of the rule would have on the administration of justice.
The purpose of our decision today in this case is to ensure that the right of access to courts is available to all, a right specifically set forth in our constitution. See art. I, § 21, Fla. Const. Clearly, in order for all to receive this fundamental right, we must apply it to all. Further, due to the administrative problems with the copy requirement, including the lack of the necessary clerical staff to undertake the additional procedures involved in strictly enforcing the requirement, our experience leads us to believe that few courts, including this Court, were able to strictly and consistently enforce it. Therefore, we cannot say that the extent of reliance factor in this case can be very large. Moreover, even assuming strict enforcement of the requirements since its inception, the statute has only been in effect since 1996 and, although we expect some disruption to the administration of justice, we believe the importance of the right being advanced, that of seeking the aid of the justice system itself, must outweigh these concerns.
We have also considered whether we should apply our ruling to "pipeline" cases only. Under that theory, however, the person seeking application of the new rule must have objected at trial.[8] Clearly, applying *531 that strict test of "pipeline" applicability would not work in this mandamus case because the underlying action here was a writ petition filed by petitioner, not his underlying criminal case. Petitioner was not asked to comply with the indigency statute in the underlying action and it was only when he attempted to appeal his case to the district court that he encountered the copy requirement. Therefore, he could not have "objected" below. While this Court could attempt to fashion a type of "pipeline" theory where the person would be able to have his or her case reopened (whether it be an original action in the circuit court, district court, this Court, or an appeal) if he or she had objected to the requirements at some point in the case, we think it would be quite difficult to set a precise definition of "objecting" because there are so many scenarios possible. Further, even if we were to attempt to set forth a definition, it seems to us that the courts would probably spend as much time trying to determine whether each particular inmate met the definition as it would be for them to just allow the inmate to refile his or her case and then decide the case on the merits. With this consideration in mind, we believe that there will be less "upheaval" to the court system in the long run to permit all inmates whose cases were dismissed for failure to comply with the copy requirement to file a motion seeking reinstatement. Further, since this Court has not struck down the payment part of the Prisoner Indigency Statute, meaning that inmates still will need to pay for their lawsuits,[9] we think some inmates will decide that their lawsuits were not sufficiently important for them to seek reinstatement. Therefore, the number of inmates seeking reinstatement should not be overwhelming. Accordingly, balancing the important right of access to courts which underlies our decision in this case with the relative disruption full retrospective application will cause to the judicial system, we conclude that the interests of justice require that the courts apply this new rule to all inmates who file motions seeking to reinstate their cases if they were dismissed for failure to comply with the copy requirement of the Prisoner Indigency Statute.
However, in order to minimize judicial upheaval, we find it necessary to set forth a time frame for the filing of such motions. As is the case with the analogous situation presented when claims are filed under rule 3.850(b)(2) (concerning new rights held to apply retroactively),[10] we hold that any motions seeking to reinstate a closed case under this decision must be filed within two years of the date this decision becomes final.
It is so ordered.
*532 SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
WELLS, C.J., concurs in result only.
NOTES
[1] Even though the Second Judicial Circuit Court in Leon County treated petitioner's petition as one seeking mandamus relief, no compliance with the Prisoner Indigency Statute was required. Based on the date of the petition, we would assume that the reason was that while the statute had gone into effect, the procedures for implementing the statute had probably not yet been put in place. Even though the court treated the petition as one seeking mandamus relief, it would appear that, for filing fee purposes, petitioner's petition was still treated by the trial court as one for habeas corpus (which has no filing fee). Since the circuit court never asked petitioner for a filing fee or an affidavit of indigency, no order on indigency was ever issued for purposes of the original petition.
[2] It took petitioner some six months and a number of orders from this Court directed to the Department of Corrections before petitioner was able to assemble his 3000 or so pages of prior pleadings so he could comply with this Court's then-policy of requiring strict compliance with the copy requirement part of the Prisoner Indigency Statute. At that time, in order to receive a thorough briefing, we appointed counsel for petitioner.
[3] That federal statute provides, in pertinent part:

In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury. 28 U.S.C. § 1915(g) (Supp. IV 1999) (emphasis added).
[4] In Hinterkopf, the Third District Court of Appeal stated that

The courts have generally disapproved financial pre-conditions to bringing claims or asserting defenses in court aside from court related filing fees. A payment to the court clerk to be used in constructing a county law library as a condition for bringing a lawsuit has been declared an undue burden on the right of free access to the courts. Flood v. State ex rel. Homeland Co., 95 Fla. 1003, 117 So. 385 (1928). Requiring a defendant in a criminal case to pay court-appointed counsel fees and certain appellate costs as a condition for being heard on a motion for supersedeas bail following conviction has been struck down on the same ground. Bell v. State, 281 So.2d 361 (Fla. 2d DCA 1973). And requiring payment of a sum of money into the registry of the court unrelated to filing fees as a condition for defending a lawsuit has long been declared constitutionally impermissible. Hovey v. Elliott, 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215 (1897).
Hinterkopf, 343 So.2d at 901.
[5] See also Bass v. Department of Corrections, 684 So.2d 834, 835-36 (Fla. 1st DCA 1996) (striking on an access to courts analysis prison rules which impermissibly restricted inmates' ability to file legal actions while in disciplinary confinement).
[6] See Wuornos v. State, 644 So.2d 1000 (Fla. 1994); Wyatt v. State, 641 So.2d 355 (Fla. 1994); Peterka v. State, 640 So.2d 59 (Fla. 1994); Elam v. State, 636 So.2d 1312 (Fla. 1994); Taylor v. State, 630 So.2d 1038 (Fla. 1993); Jackson v. Dugger, 633 So.2d 1051 (Fla.1993); Valentine v. State, 616 So.2d 971 (Fla.1993); Koon v. Dugger, 619 So.2d 246 (Fla.1993); State v. Johans, 613 So.2d 1319 (Fla.1993); Smith v. State, 598 So.2d 1063, 1066 (Fla.1992).
[7] See, e.g., Jones v. State, 528 So.2d 1171 (Fla.1988) (declined to retroactively apply Haliburton v. State, 514 So.2d 1088 (Fla.1987), which held that police failure to comply with attorney's telephonic request not to question a defendant further until that attorney could arrive was a violation of due process); State v. Safford, 484 So.2d 1244 (Fla.1986) (declined to retroactively apply State v. Neil, 457 So.2d 481 (Fla.1984), which changed the long-standing rule in Florida that a party could never be required to explain the reasons for exercising preemptory challenges); State v. Statewright, 300 So.2d 674 (Fla.1974) (declined to retroactively apply Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), which established that police must warn arrested persons of their right to remain silent before questioning).
[8] The "pipeline" theory is explained in this Court's decision in Smith v. State, 598 So.2d 1063, 1066 (Fla.1992) (citations omitted), wherein this Court stated:

We are persuaded that the principles of fairness and equal treatment ... compel us to adopt a[n] ... evenhanded approach to the retrospective application of the decisions of this Court with respect to all nonfinal cases. Any rule of law that substantially affects the life, liberty, or property of criminal defendants must be applied in a fair and evenhanded manner. "[T]he integrity of judicial review requires that we apply [rule changes] to all similar cases pending on direct review." Griffith[ v. Kentucky, 479 U.S. 314, 323, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987)].... Thus, we hold that any decision of this Court announcing a new rule of law, or merely applying an established rule of law to a new or different factual situation, must be given retrospective application by the courts of this state in every case pending on direct review or not yet final. To benefit from the change in law, the defendant must have timely objected at trial if an objection was required to preserve the issue for appellate review.
[9] Inmates will have to pay a portion of the filing fee in advance if able and make installment payments toward the full filing fee if and when any funds are deposited into their accounts. See § 57.085(4)(5), Fla.Stat. (1999).
[10] See, e.g., Dixon v. State, 730 So.2d 265 (Fla.1999) (3.850 claim permitted if filed within two years of the decision holding the right to be retroactive).