No. 56,984

Rocky A. Wentling, individually and as parent and natural guardian of Rocky Wentling and Shane Wentling, both minors, *Appellee*, v. Medical Anesthesia Services, P.A., A Kansas Corporation, *Appellant*.

(701 P.2d 939)

Opinion filed June 21, 1985.

*Larry Shoaf*, of McDonald, Tinker, Skaer, Quinn & Herrington, P.A., of Wichita, argued the cause and was on the briefs for appellant.

*Bradley Post* and *Arden J. Bradshaw*, of Post, Syrios & Bradshaw, of Wichita, argued the cause and were on the brief for appellee.

*Charles R. Hay*, of Goodell, Stratton, Edmonds & Palmer, of Topeka, was on the brief for the *amici curiae* the Kansas Hospital Association and the Kansas Medical Society.

*Mark B. Hutton*, of Michaud, Cordry, Michaud, Hutton & Hutton, of Wichita, was on the brief for the *amicus curiae* Kansas Trial Lawyers Association.

The opinion of the court was delivered by

Holmes, J.: This is a wrongful death action based upon defendant's medical malpractice in improperly administering a spinal anesthetic to plaintiff's decedent. Medical Anesthesia Services (M.A.S.) admitted liability, and trial proceeded on the issue of damages only. The jury returned a verdict in favor of plaintiff in the amount of $786,166.64. The trial court denied

defendant's motion for new trial, and this appeal followed. As defendant admitted 100% responsibility for the unfortunate death the facts need not be set forth in detail.

Plaintiff Rocky A. Wentling (Rocky, Sr.) was the husband of Joetta Kay Wentling. They were married May 10, 1975, and their first child, Rocky Shawn Wentling (Rocky, Jr.), was born September 10, 1977. Rocky, Jr. was a Down's syndrome child, and after his birth most of Joetta's time and energies were spent caring for him. Around February, 1979, Joetta became pregnant again and experienced an uneventful pregnancy. Labor began November 16, 1979, and she entered St. Joseph Medical Center in Wichita. Her labor progressed normally, and an epidural anesthetic (.25% Marcaine) was administered. Later that morning it was discovered the baby was emerging "brow first," and Joetta was informed the medical personnel were going to perform a Caesarian section to deliver the child. She was taken to the operating room about 11:00 a.m. and nurse anesthetists employed by defendant M.A.S. administered a spinal anesthetic of .75% Marcaine without the presence of a doctor and apparently without any doctor's order. The anesthetic caused Joetta to vomit and resulted in immediate seizures, cardiac arrest and a loss of consciousness. A code blue issued and the child, Shane Adair Wentling, was delivered by emergency C-section. Joetta remained in a coma until November 20, 1979, when she was pronounced dead at the age of 22. The child, Shane Adair, was a healthy normal baby and apparently has none of the problems suffered by his older brother.

Rocky, Sr. filed this action on April 20, 1981, individually and as the parent and natural guardian of his two sons. The named defendants were: St. Joseph Medical Center; Donald M. Bebak, M.D., anesthesiologist; Medical Anesthesia Services, P.A.; and Rudolfo O. Almonte, M.D., Joetta's obstetrician/gynecologist. However, St. Joseph, Bebak and Almonte were dismissed from the action after M.A.S. admitted 100% liability. Additional facts will be presented as necessary to resolve the issues on appeal.

Defendant has phrased its first issue on appeal as whether the trial court erred in "allowing the jury to consider certain elements of plaintiff's damage prayer as unlimited damages in the absence of sufficient evidence to establish a pecuniary loss." Defendant asserts the issue is primarily one of whether he met

his necessary burden of proof. At the outset, plaintiff contends defendant's present challenge to instruction No. 9 was not raised below in a timely manner and therefore may not now be entertained on appeal unless the instruction is clearly erroneous under K.S.A. 60-251(b). While it is true that defendant has switched its argument from one in the trial court of failure to use the words of the statute to one in this court of improper classification of certain elements of damage, we deem it appropriate to address the issue raised by defendant, although ordinarily the objections actually made before the jury retires may not be molded into a substantively different challenge on appeal. See *Thompson v. General Finance Co., Inc.*, 205 Kan. 76, 93, 468 P.2d 269 (1970). Instruction No. 9 given to the jury below was based upon PIK Civ. 2d 9.30, 9.31 (1981 Supp.), and reads as follows:

"Your verdict must be for the plaintiffs, and two types of damages shall be allowed, as follows:

"Limited Damages. Limited damages include mental anguish, suffering, bereavement, loss of society, and loss of companionship which you find has been and will be sustained by Rocky Shawn Wentling and Shane Adair Wentling, the children of Joetta Kay Wentling, and by Rocky A. Wentling, husband of Joetta Kay Wentling, who was killed. For these items of damage you may not allow more than $25,000 which is a limitation set by the legislature.

"Unlimited Damages. There is no legislative limit on the amount you may allow for unlimited damages. This type of damage includes all items listed below:

a) For Rocky Shawn Wentling and Shane Adair Wentling:
  1) *Loss of services, attention, parental care, advice, and protection.*
  2) *Loss of educational, physical, and moral training and guidance.*
  3) Loss of financial support which you find the deceased would have provided.
  4) Expenses for the care of the deceased caused by the injury and funeral expenses.
b) For Rocky A. Wentling:
  1) *Loss of services, attention, marital care, advice, and protection.*
  2) Loss of earnings you find the deceased would have provided.
  3) Expenses for the care of the deceased caused by the injury and funeral expenses.

"Unlimited damages must relate to a loss of money, or something by which money or something of money value may be acquired.

"For these items of damage you should allow an amount which you believe will fairly compensate their losses already sustained or which you believe will be sustained in the future.

"The amount of recovery for the above items may not exceed $2,500,000, the amount claimed by the plaintiffs." (Emphasis added.)

Defendant contends the three italicized clauses of the "unlimited damages" instruction were error because they were supported by "absolutely *no* evidence of pecuniary loss" as to those items and therefore should have been included in the limited damages portion of the instruction and made subject to the $25,000.00 limitation set by statute for nonpecuniary damages.

The jury verdict awarded plaintiff $25,000.00 in limited damages and $761,166.64 in unlimited damages. Defendant concedes there was actual dollar evidence supporting $586,071.00 of pecuniary loss and therefore contends that the verdict for pecuniary loss or unlimited damages was excessive. We do not agree.

At the time of trial the controlling statutes were K.S.A. 60-1903 and 60-1904. K.S.A. 60-1903 provided:

"**Amount of Damages.** In any such [wrongful death] action, the court or jury may award such damages as are found to be fair and just under all the facts and circumstances, but the damages, *other than pecuniary loss sustained by an heir at law,* cannot exceed in the aggregate the sum of twenty-five thousand dollars ($25,000) and costs." (Emphasis added.)

K.S.A. 60-1904 provided in part:

"**Elements of damage.** Damages may be recovered for, but are not limited to: mental anguish, suffering, or bereavement; loss of society, companionship, comfort, or protection; loss of marital care, attention, advice or counsel; loss of filial care or attention; and loss of parental care, training, guidance, or education, and the reasonable funeral expenses for the deceased."

Defendant does not contend instruction No. 9 was improper as a matter of law, but that it was improper in this case because plaintiff did not present any evidence of the dollar amount of pecuniary loss as to items (a)(1), (a)(2) and (b)(1), which will hereafter be referred to in the aggregate as "services, care and guidance." Hence, these items should have been included under the limited or nonpecuniary category of the instruction. In support of this contention defendant relies heavily on our decision in *McCart v. Muir*, 230 Kan. 618, 641 P.2d 384 (1982).

*McCart* was a consolidated wrongful death action arising from a two-vehicle accident in which five children were killed. Among the issues raised on appeal were the nature and amount of the damages allowable under the July 1, 1975, amendment to K.S.A. 60-1903. Based on the statutory distinction between pecuniary loss and nonpecuniary loss, we held that a jury should

not award as damages one blanket sum of money, but should separately state the award granted for each of the two categories of damages, so the court could determine whether there was compliance with the $25,000 limitation on nonpecuniary loss imposed by statute. We said:

"On reading the statute certain questions come to mind. The statute treats pecuniary loss and nonpecuniary loss differently. K.S.A. 60-1903 places a limitation of $25,000.00 on nonpecuniary loss arising from a wrongful death. No dollar limitation is placed on pecuniary loss. A court or jury may award such damages for pecuniary loss as are found to be fair and just under all the facts and circumstances. We find no cases which discuss this particular section of the law which became effective July 1, 1975.

.  .  .  .

"K.S.A. 60-1904 sets forth mixed elements of damage, both nonpecuniary and pecuniary, which may be recovered, but the statute specifies that damages are not limited to those items mentioned. Nonpecuniary damages generally are intangible in nature such as mental anguish, bereavement, loss of society and loss of companionship. These are listed along with *pecuniary damages, such as loss of care,* funeral expenses, and other personal expenses arising from the accident.

"Pecuniary damages are '[s]uch as can be estimated in and compensated by money;  .  .  .  all such loss, deprivation, or injury as can be made the subject of calculation and of recompense in money.' Black's Law Dictionary 469 (4th ed. rev. 1968). A pecuniary loss has been defined as a loss of money or of something by which money or something of money value may be acquired. 22 Am. Jur. 2d, Damages § 1, p.14. Pecuniary loss or damages in a wrongful death case should be equivalent to those pecuniary benefits or compensation that reasonably could have been expected to have resulted from the continued life of the deceased. *Ches. & Ohio Ry. v. Kelly,* 241 U.S. 485, 489, 60 L.Ed. 1117, 36 S. Ct. 630 (1916)." (Emphasis added.) 230 Kan. at 625-26.

The 1975 amendment to K.S.A. 60-1903 was the first to treat pecuniary and nonpecuniary damages in a wrongful death action as separate and distinct from one another. Prior to that, the Kansas wrongful death act set one limitation on recoverable damages, which included both pecuniary and nonpecuniary items. As a result, the standards of proof necessary to justify each type of award became interwoven. In *McCart* the court went on to say:

"This court has since [the 1947 amendment to the statute, which allowed recovery of nonpecuniary losses for the first time,] upheld substantial awards upon meager evidentiary showings of actual loss. Such a practice may continue in the future as to nonpecuniary loss which comes under the $25,000.00 limitation of the statute. However, the same practice would not seem proper with regard to pecuniary losses which [after the 1975 amendment to K.S.A. 60-1903] now bear no limitation. With no statutory limitation on pecuniary losses some definite

standards of proof must be required to support any award for substantial pecuniary losses.

"Therefore, it would appear that separate treatment must now be given to pecuniary and nonpecuniary losses. Different standards of proof should be used in establishing these losses. No new standard of proof would appear necessary in case of nonpecuniary loss for our pre-1975 standards should suffice. *For pecuniary losses, however, the elements and methods of proof must be more precise. The supporting evidence should establish some reasonable basis for an expectation of future monetary benefits and the evidence should further establish some reasonable method to arrive at the amount allowed for pecuniary loss.* The pre-1947 cases in Kansas should be a helpful source of information to draw on for the new standards of proof necessary to establish pecuniary loss under the present law.

"Suffice it to say under the provisions of K.S.A. 60-1903 which now limit the nonpecuniary damages allowable in a wrongful death case to $25,000.00 and which now impose no limit on pecuniary damages, the jury must be required to separately state the amounts allowed for pecuniary loss and for nonpecuniary loss for each wrongful death. *When the pecuniary loss allowed is substantial in amount, evidence in support thereof must have some reasonable basis in fact and can no longer be supported solely by an implication of pecuniary loss based on the severance of the parent-child relationship.*" (Emphasis added.) *McCart*, 230 Kan. at 628-29.

Defendant M.A.S. seizes on the italicized language from *McCart* and contends it requires evidence which at a minimum provides the jury with monetary figures sufficient to calculate both the value of the loss and the proposed compensation. Defendant then argues that insofar as plaintiff Wentling presented no evidence of pecuniary loss regarding decedent's services to her husband, and services and guidance to her children, those losses are nonpecuniary in nature, subject to the statutory $25,000 limitation, and should not have been included in the "unlimited damages" portion of instruction No. 9. Plaintiff responds this broad interpretation of *McCart* is not borne out by the language of that opinion, and that he was not required to present expert economic testimony regarding the value of the loss of services, care and guidance to support a jury award.

This case requires us to further consider our statements in *McCart* regarding the standard of proof required to justify an award for pecuniary damages for loss of services, care and guidance. It cannot be seriously disputed that these losses are pecuniary in nature. We acknowledged as much in *McCart,* noting that K.S.A. 60-1904 lists nonpecuniary damages "along with pecuniary damages, such as *loss of care* . . . ." (Emphasis

added) 230 Kan. at 626. See also Douthwaite, Jury Instructions on Damages in Tort Actions, Ch. 7-1, p. 270 (1981):

"Pecuniary loss may be either a loss arising from deprivation of something to which these [plaintiffs] would have been legally entitled had this life not been taken; or it may be a loss arising from a deprivation of benefits that could reasonably be expected to have been received, originating from no more than a moral obligation. *This includes not only money but anything that can be valued in terms of money.*

"*The fact that such matters as loss of care, training, advice, guidance and education are not readily reduced to a present money value does not mean that those factors need not be taken into consideration.*'" (Emphasis added.)

We now turn to the question of the sufficiency of proof necessary to support an award of pecuniary damages for loss of services, care and guidance suffered by a surviving spouse and children. In *McCart* we noted the pre-1947 Kansas cases, in which pecuniary damages alone were recoverable in a wrongful death action, "should be a helpful source of information to draw on for the new standards of proof necessary to establish pecuniary loss under the present law." 230 Kan. at 628-29. Defendant M.A.S. points to three cases in particular to support its contentions. In *A.T.& S.F. Rld. Co. v. Brown, Adm'r*, 26 Kan. 443, 460-61 (1881), we sustained a district court's ruling a $10,000 award for pecuniary damages was excessive where there was *no* evidence the claimant, decedent's wealthy mother who for a considerable period actually supported her son, suffered any pecuniary loss from his demise. A similar determination was made in *Coal Co. v. Limb*, 47 Kan. 469, 28 Pac. 181 (1890), where again there was *no* evidence decedent's parents, as next of kin, had ever received any actual pecuniary benefits from their son during his lifetime, nor was there a showing of a reasonable probability of pecuniary advantage to them from the continuance of his life. Finally, in *Pattrick v. Riggs*, 148 Kan. 741, Syl. ¶ 1, 84 P.2d 840 (1938), we held that the amount of recovery in a wrongful death action is limited to plaintiff's financial loss. These cases, however, are in virtually every aspect distinct from the matter presently before us and are readily distinguishable.

On the other hand, we took a different approach in *Brick Co. v. Fisher*, 79 Kan. 576, 100 Pac. 507 (1909), a case in which a twenty-one-year-old man was killed during his employment. He had left home at the age of nineteen. However, he continued to enjoy a good relationship with his parents. In an action by his administrator against the employer the jury returned a verdict

which included lost pecuniary benefits which might have been realized by the parents at some future date. There appears to have been no specific evidence of the monetary value of such possible future services. In affirming the judgment, Justice Burch said:

"It is not only reasonable to suppose but it is quite certain that these parents would have been pecuniarily advantaged by the continued life of their son, and under all the decisions of this court sufficient data appeared from which *the jury, taking into consideration the knowledge and experience common to all men, could compute the damage they suffered from his death.* [Citations omitted.]" (Emphasis added.) 79 Kan. at 582-83.

Modern authorities and the prevailing view do not take the strict stand advocated by defendant in determining the standard of proof necessary to support an award of pecuniary damages.

"As with future economic or non-economic losses in personal injury actions, *the plaintiffs in wrongful death actions are not required to prove their losses with mathematical certainty.* What is necessary is that each claim for a specific element of damage be supported by evidence sufficient to permit the trier of fact to determine (1) that the claimant in fact suffered a compensable loss or injury; and (2) a fair and reasonable monetary award for that loss or injury. Damages may be withheld where such proof is lacking and thus where the award would have to be based entirely on conjecture or speculation.

"In many instances, however, *the burden of proof can be satisfied simply through a showing of the nature and extent of the loss asserted.* For example, evidence that a deceased spouse and parent regularly performed household services—cooking, cleaning, maintenance, or similar undertakings—should be sufficient to warrant an award of damages to the surviving spouse and children for the loss of those services even in the absence of proof of their value. In such cases, *the triers of fact are presumed to be capable of converting the losses into monetary equivalents on the basis of their own experiences and knowledge.*

. . . .

"However, *where the loss claimed—for example, future earnings* based on a projected work-life expectancy, career advancement, and accumulation of fringe benefits—*involves matters which lie beyond the competency of average jurors, the plaintiff may present expert testimony to establish the extent of the loss.* However, even where such evidence is admitted, the trier of fact will not be bound by the expert's testimony and may accord the testimony little or as much weight as it deems appropriate. As one federal Court of Appeals has noted, 'It is difficult to conceive of a more subjective task than placing a dollar value on the tragic loss of a human life.' [Novak v. Gramm, 469 F.2d 430 (8th Cir. 1972).]

. . . .

"It is well-settled that the measurement of damages in a wrongful death action must be approached as an issue of fact. Each case must be decided on its own merits. . . . [N]umerous factors may separately, and in configuration with one another, affect the damages to which a given beneficiary should be entitled

as fair and just compensation for losses and injuries suffered as a proximate result of the deceased's death.

· · · ·

"Given the probably unlimited combinations of factors which may be brought to bear on the overall damages issue in death actions and on certain elements of loss or injury—for example, destruction of the intangible elements of a family relationship, the calculation of damages simply cannot be performed with any degree of mathematical precision. Even economic injuries, such as loss of support, have been characterized as 'speculative in nature' and incapable of precise calculation.

"Notwithstanding the impossibility of proving damages with certainty, recovery should not be denied in these cases. One of the more eloquent statements of the policies favoring this result can be found in a 1931 opinion of the United States Supreme Court. Although the case involved an antitrust action, the sentiments are equally applicable to any broad-brush challenge to the validity of damages where their measurement is necessarily speculative to some extent:

'Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amends for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show[s] the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. *The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.' [Story Parchment Co. v. Paterson Co.*, 282 U.S. 555, 75 L. Ed. 544, 51 S.Ct. 248 (1931).]

"The 'nature of the beast' thus requires that the trier of fact be accorded wide discretion in the determination of an award of damages, and this grant of discretion indeed represents the prevailing rule. A wrongful death award will be overturned on review only where it can be characterized as clearly erroneous on the evidence which was before the trier of fact.

"The clear error standard of review leads in most cases to affirmance of the trial court's determination of damages. Ordinarily, reversal will be warranted only where:

(1) there was no evidence at all to establish the element of loss upon which the award in issue was based; or

(2) the award was so patently contrary to the evidence as to shock the conscience of the court."

(Footnotes omitted; emphasis added.) 3 Minzer, Nates, Kimball, Axelrod and Goldstein, Damages in Tort Actions § 22.02[2] (1984).

See also Annot., Admissibility and Sufficiency of Proof of Value of Housewife's Services, in Wrongful Death Action, 77 A.L.R. 3d 1175 and cases cited therein. The annotation, after stating that no specific evidence of monetary value is required in the states of Georgia, Illinois, Iowa, Kentucky, Michigan, Mississippi, Missouri and Texas, goes on to state:

"It was the opinion of the court in Dodson v. Richter (1962) 34 Ill App 2d 22, 180 NE2d 505, that in an action to recover for the wrongful death of a housewife, the survivors are entitled to the benefit of a presumption of pecuniary loss sufficient to warrant a recovery of some substantial damages without any proof of the dollar value of her services. The death alone, the court declared, is presumed to result in pecuniary injuries to the next of kin, and whether they had been in the habit of claiming and receiving pecuniary assistance from the deceased was an immaterial question. The evidence presented does not fail in an action under the wrongful death act, stated the court, because it fails to show that the decedent contributed any money to the support of her family or because there is no proof offered of the reasonable value of the services performed.

"The court in Schmitt v. Jenkins Truck Lines, Inc. (1969, Iowa) 170 NW2d 632, 46 ALR3d 636, expressed the view that a jury award for loss of a parent's services in favor of the children need not be supported by evidence capable of exact mathematical computation. In declaring that, in particular, the value of a housewife's services can be recovered without precise quantitative measurement in terms of money, the court expressed that such services are in a different category than compensated employment, yet no one claims that such services are not valuable. They should be recognized in the realm of law, the court declared, as in the domain of economics.

"The court in Standard Coffee Co. v. Carr (1934) 171 Miss 714, 157 So 685, expressed the opinion that it is not necessary in an action for the wrongful death of a housewife to show the actual money value of the loss of her services, since it is difficult to value the services of a wife and mother in terms of money, and the jury is as competent as any witness could be in determining the answer to such a question.

"The court in Community Natural Gas Co. v. Lane (1939, Tex Civ App) 133 SW2d 200, declared that it was well established that a jury in a wrongful death action could estimate the value of the services of a deceased wife from testimony detailing the character of such services, and it was not necessary that witnesses should give a money estimate of the value." pp. 1202-03.

While we recognize that reliance on decisions from other states may be questionable as the wrongful death statutes vary from state to state, the rule followed in these states would appear to us to be the better and more equitable rule and well within our own statutes and the decision in *McCart*.

With this background in mind we turn to the plaintiff's evidence at trial concerning loss of services, care and guidance. The plaintiff's own testimony contains adequate evidentiary support for the trial court's instruction No. 9. Briefly, Rocky A. Wentling testified in detail concerning the couple's closeness in their marriage, Joetta's care during his illnesses, and even her on-site assistance at some of his construction jobs. Although Joetta was naturally upset with her first son's handicap, she and her husband determined to keep the boy at home rather than place him

in an institution or foster home. Joetta appears to have been the moving force in her first son's life. She joined support groups, read extensively for information on Down's syndrome, spent time with the physical therapist for instructions on how to work with him, and attended to all the child's medical problems. Rocky, Sr. testified Joetta spent at least 98 hours per week providing services, care and guidance.

Plaintiff's expert witness, Dr. Durham, was a professor of economics from Texas Christian University. He testified as to certain services performed by Joetta which had a specific monetary value. These included her duties as dietitian, chauffeur, buyer, cook, dishwasher, housecleaner, laundress, nurse, and others. Based upon her age and projected time of retirement, he established a monetary value of $586,071.00 for these items. Dr. Durham testified as well about what elements of loss were *not* included in that figure. These additional economic losses associated with the death of a homemaker were not included in his computations because he couldn't place a specific dollar figure on them. He identified these economic losses as including moral training, social training, educational assistance (particularly with a handicapped child), a mother's role as nurturer and counselor, companionship, services to her husband, and more. Even though it is difficult to place a dollar figure on such losses, the professor testified they nevertheless have real economic value insofar as they contribute to a person's welfare and ability to mature, interact and obtain productive employment in society. Other items not considered in his estimate of financial loss included the loss associated with the children growing up in a shattered family rather than a traditional nuclear family, the increased quality of services to be expected as a homemaker gains experience, the greater productivity associated with a person who enjoys her work, and the unique value of Joetta's special services to her handicapped child, Rocky, Jr. Plaintiff's testimony also showed the jury the extent of services, attention, marital care, advice and protection he was receiving from his wife, as well as the parental care, services, educational, physical, and moral training and guidance Joetta bestowed on the first child and would have, in all probability, also given to the second child.

Is the inability of plaintiff and his expert witness to translate the loss of services, care and guidance into a specific monetary

figure fatal, under *McCart*, to plaintiff's recovery? We think not. Plaintiff has satisfied his burden of proof by showing the nature and extent of these losses, and the triers of fact are presumed to be capable of converting the losses into monetary equivalents on the basis of their own experience. In this case the award cannot be said to have been based on "speculation" as there is little doubt from plaintiff's testimony he and his children actually suffered these losses, perhaps even to an aggravated degree, when one considers the special person Joetta Wentling appears to have been. To hold otherwise would allow the defendant tortfeasor a virtual windfall simply because these losses are not capable of precise measurement. In addition there is really no serious contention that the care, guidance and services of a spouse and parent lack monetary value. Considering these particular pecuniary losses, plaintiff's evidence at trial satisfied his burden of proof under *McCart* probably to the full extent it is possible to do so. If his testimony is deemed not sufficient, it is unclear what, if any, further evidence could have been offered to satisfy defendant. The mere fact these items of loss, having acknowledged economic value, are incapable of exact economic *valuation* does not mean plaintiff should be denied recovery. The jury was capable of exercising its collective experience and judgment in this matter, and evidently did so as shown by the difference between the amount of the verdict it returned ($761,166.64) and the amount of actual dollar loss testified to by plaintiff's expert economist ($586,071.00.) Indeed, we do not know how the jury reached the higher figure. It may have determined the expert's figures (many of which were based upon the minimum wage) were too low and increased the calculations for which actual figures were presented.

As all parties concede the losses herein, services, care and guidance, are valuable per se and pecuniary in nature, the loss of those services presents a sufficient issue for the jury and it is the province of the jury to determine the monetary value of such loss. When a plaintiff has shown an actual loss of such elements of damage and the extent thereof, the jury is not precluded from considering such items in arriving at its verdict even though actual dollar evidence of value has not been presented. There can be no doubt plaintiff and his two small sons' suffered a pecuniary loss when deprived of the services, care and guidance

of Joetta and, having clearly shown such deprivation, it was for the jury to determine the dollar amount of the loss. That is not to say that testimony of the monetary value of such losses is not desirable and certainly it is relevant and admissible to aid the jury in its deliberations if it is available and presented. However, failure to present such expert testimony does not convert what are otherwise admitted pecuniary losses into nonpecuniary losses as contended by defendant. The character of the loss remains the same and the bottom line issue is whether there was sufficient basis for and evidence to support the jury verdict. When the abstract statements in *McCart* regarding burden of proof are viewed with a realistic perception of what is actually capable of proof in a case such as this, we conclude instruction No. 9 was proper. The trial court did not err in including services, care and guidance under the unlimited or pecuniary category of the instruction.

Defendant has also argued that the instruction was erroneous because it contains the words "limited" and "unlimited" as opposed to "pecuniary" and "nonpecuniary" used in the statute. The instruction was based upon PIK Civ. 2d 9.30, 9.31 (1981 Supp.). The use of the terms in the instruction as opposed to those in the statutes constitutes a distinction without a difference. This argument is wholly without merit.

The second issue raised on appeal is whether the trial court erred in ruling K.S.A. 60-471 unconstitutional. That statute, first enacted in 1976, abrogates certain elements of the common-law collateral source rule. The rule has been described by one authority as follows:

"The collateral source rule permits an injured party to recover full compensatory damages from a tortfeasor irrespective of the payment of any element of those damages by a source independent of the tortfeasor. The rule also precludes admission of evidence of benefits paid by a collateral source, except where such evidence clearly carries probative value on an issue not inherently related to measurement of damages." 3 Minzer, Nates, Kimball, Axelrod and Goldstein, Damages in Tort Actions § 17.00, p. 17-5 (1984).

K.S.A. 60-471(a) provides:

"**Admissibility of evidence of reimbursement or indemnification received by injured party in damage action for act or omission of health care provider; disclosure at pretrial conference; definitions.** (a) In any action for damages for personal injuries or death arising out of the rendering of or the failure to render professional services by any health care provider, evidence of any reimburse-

ment or indemnification received by a party for damages sustained from such injury or death, *excluding payments from insurance paid for in whole or in part by such party or his or her employer,* and services provided by a health maintenance organization to treat any such injury, *excluding services paid for in whole or in part by such party or his or her employer,* shall be admissible for consideration by the trier of fact subject to the provisions of subsection (b). Such evidence shall be accorded such weight as the trier of fact shall choose to ascribe to that evidence in determining the amount of damages to be awarded to such party." (Emphasis added.)

Prior to trial plaintiff filed a motion in limine requesting exclusion of any evidence concerning "payment of medical or other expense by insurance, collateral source, [or] otherwise—also [excluding] any reference as to whether or not any bills have been paid." In support he relied on a decision of one federal district court judge in this state holding K.S.A. 60-471 unconstitutional. Defendants countered with "an equally persuasive opinion" by a different federal district court judge in Kansas upholding the constitutionality of K.S.A. 60-471. The trial judge, without elaboration or explanation, held simply "the statute is unconstitutional."

The arguments now raised by the parties mirror the split over this issue by the judges in the federal district court of this state. K.S.A. 60-471 was upheld by Judge Richard Rogers against equal protection challenges in *Marlatt v. Hutton,* No. 76-46-C5 (D. Kan., unpublished opinion filed April 3, 1979), and again in *Holman v. The Menninger Foundation,* No. 79-4090 (D. Kan., unpublished opinion filed July 13, 1982). That conclusion and the analytical approach employed by Judge Rogers are now urged upon us by defendant M.A.S., as well as the Kansas Medical Society and the Kansas Hospital Association in an *amici curiae* brief. On the other hand, plaintiff Wentling, and the Kansas Trial Lawyers Association, as *amicus curiae,* rely on Judge Frank Theis' ruling in *Doran v. Priddy,* 534 F. Supp. 30 (D. Kan. 1981), that K.S.A. 60-471 violates the equal protection clauses of both the United States and Kansas Constitutions. Although the two courts reached opposite conclusions, both agree the question of the constitutionality of K.S.A. 60-471 is "troublesome." *Doran* was a diversity action in which the minor plaintiff sought to recover for medical malpractice causing him permanent brain damage and other injuries before and during his birth. The magistrate who entertained plaintiff's motion in

limine confined evidence of collateral source benefits to those received prior to trial. Defendant sought the district court's review of that ruling, during which plaintiff contended K.S.A. 60-471 was unconstitutional under both the federal and state constitutions. Judge Theis prefaced his analysis by recognizing that the general common-law rule in Kansas was to exclude evidence showing damages claimed by a party were in fact paid by someone else, or that services had been provided gratuitously. He then noted plaintiffs' hypothetical example showing the inequitable treatment of two patients suffering similar injuries at the hands of the same health care provider:

"One is wealthy, and has insurance, while the other has no resources to pay for medical care and is uninsured. The first is able to retain private nursing care, which is paid for by the insurance, while the second, needing the same continual care, is cared for by his wife, who was forced to quit her job to stay home and care for him. It is said the modified collateral source rule would exclude evidence that the private nursing care for the first patient was in fact paid for by the insurance company, while the jury would be apprised of the fact that the second patient's care was provided free by his wife, and perhaps she had been earning only the minimum wage at the job she left." 534 F. Supp. at 36.

If the statute is to be applied according to its plain language, an even more invidious hypothetical example comes to mind. Assume a married couple is injured in the same catastrophe. They are both treated by the same health care provider with disastrous results. The husband is employed and his employer provides health insurance. The wife is not gainfully employed. In separate actions for similar treatment provided by the same health care provider as a result of the same catastrophe, the fact that the wife's medical expenses were paid by insurance is proper evidence to submit to the jury but the same evidence as it applies to the husband is not. Such a distinction makes no sense whatsoever.

In *Doran,* Judge Theis stated:

"The instant case deals with a rule of evidence which first applies to parties claimed to have been injured through the wrongful conduct of another only if the putative tort-feasor is a health care provider. It then further discriminates between those who pay for insurance, or have such benefits from their employment, and anyone who must rely upon charity or other gratuitous care. Even if we assume medical malpractice statutes which single out one profession for special protection from rising costs for tortious conduct in a time of general inflation betoken legitimate interests, these interests are not thwarted by requiring more even treatment of indigent injured parties with other classes of injured parties

referenced in the same statute. The statute before the Court embodies elements of putativeness and discrimination which violate the rights of citizens to equal treatment under the law. Like the differences in treatment between classes of civil judgment debtors, the discrimination between classes of medical malpractice plaintiffs is lodged within the heart of the judicial process. Rules governing the admissibility of evidence in a civil trial is a type of discrimination not to be approved automatically. Rather, the Court must apply a scrutiny which, as the United States Supreme Court has called it in another context, is 'not a toothless one.' *Trimble v. Gordon,* 430 U.S. 762, 97 S. Ct. 1459, 52 L. Ed.2d 31 (1977) (illegitimacy not a suspect class, but statute unconstitutional).

"This statute is intended to keep down the costs of medical malpractice insurance, and to limit the size of medical malpractice verdicts. The distinction between insured plaintiffs, and ones who must rely upon kindness for some of their pre-litigation care, is not one which furthers that goal. Rather, it substantially undermines that purpose, and at the expense of the indigent litigant. It therefore is violative of the right of all litigants to equal protection under the Fourteenth Amendment to the United States Constitution." *Doran,* 534 F. Supp. at 37.

The court went on to state that the statute also ran afoul of the Kansas Constitution. A majority of the members of this court are in agreement with the conclusions reached by Judge Theis in *Doran.* We hold K.S.A. 60-471 is unconstitutional as a violation of the equal protection of the law provisions of both the United States and Kansas Constitutions. The trial court did not err in so holding.

We pause to note that the 1985 Legislature evidently recognized some of the shortcomings of the statute in repealing K.S.A. 60-471 and adopting new legislation. L. 1985, Ch. 197, §§ 3, 5.

Finally, defendant contends the trial court erred in its instruction No. 10. As the arguments pertain to the exclusion of evidence under K.S.A. 60-471 and the consideration to be given to the value placed by Dr. Durham upon the loss of parental care performed by Joetta, we deem the issue to be without merit in view of what has been said earlier in this opinion.

The judgment is affirmed.

MCFARLAND, J., dissenting in part and concurring in part: I dissent from that portion of the opinion holding K.S.A. 60-471 (as it existed prior to repeal by the 1985 legislature) unconstitutional.

As noted in the majority opinion, two federal courts in Kansas have reached different results on the question of the constitu-

tionality of K.S.A. 60-471. I believe that the rationale of Judge Richard Rogers is well reasoned and legally sound. I adopt the same as expressed in *Holman v. The Menninger Foundation,* No. 79-4090 (D. Kan., unpublished opinion filed July 13, 1982) as follows:

"The question of the constitutionality of K.S.A. 60-471 is more troublesome. The judges in this district have reached differing conclusions. In *Marlatt v. Hutton,* No. 76-46-C5 (D. Kan., unpublished, 4/3/79), this court found the statute to be constitutional. We stated:

" 'Although the wisdom of the statute in terms of its societal impact may be questioned, we are convinced that there exists a rational basis for singling out those who received gratuitous services at no cost which they are not obligated to repay. Those persons simply did not suffer compensable economic damage for the value of such services, either before the fact in the form of insurance premiums or after the fact in the form of subrogation payments or derivative rights of recovery vested in the third party. In deciding that malpractice plaintiffs should be limited in their recoveries to a sum which more closely approximates their actual economic loss, the Legislature did not draw arbitrary distinctions. And, as defendant points out, the statute will also work to limit recovery by those who are not welfare recipients but have received gratuitous services; care in the home by family members would perhaps be the most expected case.

" 'Plaintiff does not claim that the statute unfairly singles out malpractice plaintiffs as a class, as opposed to plaintiffs injured by any other type of tortfeasor. Rather, the claim is that within the class of malpractice plaintiffs, those who have received gratuities are unfairly treated. There exists a rational basis for this discrimination among malpractice plaintiffs, and we thus reject the equal protection arguments of plaintiff.'

"Thereafter, Judge Theis examined the statute in *Doran v. Priddy,* [534 F. Supp. 30 (D. Kan. 1981)], and found it to be unconstitutional. Judge Theis reasoned:

" 'The instant case deals with a rule of evidence which first applies to parties claimed to have been injured through the wrongful conduct of another only if the putative tortfeasor is a health care provider. It then further discriminates between those who pay for insurance, or have such benefits from their employment, and anyone who must rely upon charity or other gratuitous care. Even if we assume medical malpractice statutes which single out one profession for special protection from rising costs for tortious conduct in a time of general inflation betoken legitimate interests, these interests are not thwarted by requiring more even treatment of indigent injured parties with other classes of injured parties referenced in the same statute. The statute before the Court embodies elements of putativeness and discrimination which violate the rights of citizens to equal treatment under the law. Like the differences in treatment between classes of civil judgment debtors, the discrimination between classes of medical malpractice plaintiffs is lodged within the heart of the judicial process. Rules governing the admissibility of evidence in a civil trial are a type of discrimination not to be approved automatically. Rather, the Court must apply a scrutiny which, as the United States Supreme Court has called it in another context, is 'not a toothless

one.' *Trimble v. Gordon,* 430 U.S. 762 (1977) (illegitimacy not a suspect class, but statute unconstitutional).

" 'This statute is intended to keep down the costs of medical malpractice insurance, and to limit the size of medical malpractice verdicts. The distinction between insured plaintiffs, and ones who must rely upon kindness for some of their pre-litigation care, is not one which furthers that goal. Rather, it substantially undermines that purpose, and at the expense of the indigent litigant. It therefore is violative of the right of all litigants to equal protection under the Fourteenth Amendment to the United States Constitution.' [p. 37.]

"The divergence of opinion within this district on the constitutionality of this type of legislation is reflective of the courts across the country. Courts throughout the country have faced numerous equal protection challenges to statutes affecting medical malpractice recovery rights. The results have been far from uniform. Compare *Fein v. Permanente Medical Group,* 175 Cal. Rptr. 177 (Cal. App. 1981); *Pinillos v. Cedars of Lebanon Hospital Corp.,* 403 So.2d 365 (Fla. 1981); *DiAntonio v. Northampton-Accomack Memorial Hospital,* 628 F.2d 287 (4th Cir. 1980); *Rudolph v. Iowa Methodist Medical Center,* 293 N.W.2d 550 (Iowa 1980); *Woods v. Holy Cross Hospital,* 591 F.2d 1164 (5th Cir. 1979); *Seoane v. Ortho Pharmaceuticals, Inc.,* 472 F.Supp. 468 (E.D. La. 1979); *State ex rel. Strykowski v. Wilkie,* 81 Wis.2d 491, 261 N.W. 2d 434 (1978); *Eastin v. Broomfield,* 116 Ariz. 576, 570 P.2d 744 (1977) with *Carson v. Maurer,* 120 N.H. 925, 424 A.2d 825 (1980); . . . . *Arneson v. Olson,* 270 N.W.2d 125 (N.D. 1978); *Simon v. St. Elizabeth Medical Center,* 3 O.O.3d 164 355 N.E. 2d 903 (Ct.Cmn.Pl. 1976); *Graley v. Satayatham,* 74 O.O.2d 316, 343 N.E.2d 832 (Ct. Cmn. Pl. 1976). A review of these cases reveals that the outcome hinges substantially on which equal protection standard of review is employed. The issue of the proper test to employ on the instant statute was not discussed in any great detail in the previous decisions in the District of Kansas. Therefore, we shall examine that issue in some detail.

"Three standards have been employed by the Supreme Court in reviewing legislation on equal protection grounds. At one end of the spectrum is the 'rational basis' or 'reasonable relationship' test. This standard was set forth in *McGowan v. Maryland,* 366 U.S. 420, 425-26 (1961), as follows:

'The constitutional safeguard of [equal protection] is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.'

Thus, a statute comes before the court presumed to be constitutional and it is the duty of the one attacking the statute to sustain the burden of proof. *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78-79 (1911).

"At the other end of the spectrum is the 'strict scrutiny' or 'compelling state interest' standard. The strict scrutiny test is applicable to legislation which regulates the exercise of a fundamental right, *see, e.g., Shapiro v. Thompson,* 394 U.S. 618 (1969) (right to travel); *Dunn v. Blumstein,* 405 U.S. 330 (1972) (right to vote), or singles out a 'suspect' class of persons for special treatment, *see e.g.,*

*Loving v. Virginia,* 388 U.S. 1 (1967) (race); *Oyama v. California,* 332 U.S. 633 (1948) (national origin); *Graham v. Richardson,* 403 U.S. 365 (1971) (alienage). In order for a law to stand under this standard, the state has the burden of demonstrating a compelling governmental interest in making the classification. *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 16-17 (1973).

"In addition to the aforementioned standards, the Supreme Court has established a middle ground approach for certain situations. This measure of review has been called the 'substantial relationship' test. Under this standard, a 'classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial [r]elationship to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' *Reed v. Reed,* 404 U.S. 71, 76 (1971) (quoting *Royster Guano Co. v. Virginia,* 235 U.S. 412, 415 (1920)). The Supreme Court has restricted its application of this test to cases involving classifications based upon gender and illegitimacy. See *Lalli v. Lalli,* 439 U.S. 259 (1979) (illegitimacy); *Trimble v. Gordon,* 430 U.S. 762 (1977) (illegitimacy); *Reed v. Reed, supra* (gender).

"None of the classifications created by K.S.A. 60-471 involve a suspect classification, such as race, alienage or nationality, that would require the application of the strict scrutiny standard. Nor do we find any support to apply the 'substantial relationship' test since the classifications are not based upon gender or illegitimacy. Accordingly, it is clear that the rational relationship test should be applied here.

"In *Marlatt,* we did, in finding the statute constitutional, apply the rational relationship test. However, Judge Theis, in *Doran,* in finding that the statute was unconstitutional, apparently relied upon the 'substantial relationship' test articulated in *Trimble v. Gordon, supra.* The importance of the decision regarding which standard to apply is great. In other cases which have upheld the constitutionality of statutes designed to abrogate the collateral source rule, the rational relationship standard was applied. *See Fein v. Permanente Medical Group, supra; Pinillos v. Cedars of Lebanon Hospital Corp., supra; Rudolph v. Iowa Methodist Medical Center, supra; Eastin v. Broomfield, supra.* However, in each of the cases where the statutes have been found to be unconstitutional, a stricter standard of review has been applied. *See Carson v. Maurer, supra; Arneson v. Olson, supra; Simon v. St. Elizabeth Medical Center, supra; Graley v. Satayatham, supra.*

"A review of the legislative history behind K.S.A. 60-471 is instructive in ascertaining the objective behind the passage of the statute. In 1975 and 1976, the Kansas legislature studied the effect of medical malpractice actions on the distribution and provision of medical and hospital care for Kansas recipients. In January, 1976, the report of the Special Committee on Medical Malpractice concluded as follows:

" 'During the past six months some Kansas health care providers have experienced steep premium increases and, in some cases, difficulty in obtaining professional liability insurance coverage at any price. The 'crisis' in the malpractice insurance market in Kansas presently appears to be limited to physicians and some hospitals. Other providers have not, as yet, had difficulty in obtaining insurance.

" 'The committee found that changes in the malpractice insurance market

threaten health care in Kansas since some physicians believe that they will not be able to continue in practice under such conditions. An adverse effect also arises from passing on the increased cost of insurance through patient charges or daily room charges.'

Thereafter, the legislature passed several bills, including Senate Bill 649 which eventually was codified at K.S.A. 60-471, attempting to rectify the malpractice 'crisis'. It appears from the legislative history of K.S.A. 60-471 that it was passed as an attempt to reduce the size of malpractice verdicts by allowing introduction of evidence on the portion of the loss paid by certain collateral benefits. The reduction of verdicts would presumably result in a reduction in premiums for malpractice insurance, making it affordable and available, helping to assure the public of continued health care services.

"After due consideration of the foregoing, we shall reaffirm our decision in *Marlatt*. The plaintiffs have failed to show that there is no rational basis for the distinctions drawn by this statute. We hold that the classifications created by K.S.A. 60-671 bear a rational relationship to the legitimate state interest of protecting the public health by ensuring the availability of adequate medical care for the citizens of Kansas. Accordingly, we find K.S.A. 60-471 to be constitutional and we choose not to follow the opinion by Judge Theis in *Doran v. Priddy, supra*."

SCHROEDER, C.J., joins the above dissenting and concurring opinion.