**Janice L. COCHRANE and Patrick Cochrane, Plaintiffs,**

v.

**SCHNEIDER NATIONAL CARRIERS, INC., Defendant.**

**No. 96–2342–JWL.**

United States District Court,
D. Kansas.

Oct. 24, 1997.

---

James W. Jeans, Kansas City, MO, James W. Jeans, Sr., Platte City, MO, for Plaintiffs.

R. Denise Henning, Richard E. McLeod, The McLeod Law Firm, Kansas City, MO, for Defendant.

### MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

Plaintiffs brought this wrongful death and survival action after their minor son died in a car accident with defendant's employee. On June 30, 1997, the court granted summary judgment in favor of defendant on the survival claim. *Cochrane v. Schneider Nat'l Carriers, Inc.*, 968 F.Supp. 613 (D.Kan.1997). On September 23, the court granted defendant summary judgment on plaintiffs' claim that defendant was negligent in instructing its driver, but denied summary judgment on plaintiffs' claim that the driver was negligent in turning where she did. *Cochrane v. Schneider Nat'l Carriers, Inc.*, 980 F.Supp. 371 (D.Kan.1997). The matter is presently before the court on defendant's motion in limine (Doc. 51), by which it seeks to exclude from evidence testimony by plaintiffs' expert economist, Dr. Gerald Olson. The court sustains the motion in part and overrules it in part, and Dr. Olson may only testify in accordance with this opinion.[1]

### I. Dr. Olson's Proposed Testimony

Dr. Gerald Olson is a professor of economics at the University of Missouri–Kansas City. Upon plaintiffs' request, Dr. Olson prepared a report estimating the loss to the "survivors" of decedent.

Dr. Olson essentially computed three separate categories of loss. For each category, Dr. Olson estimated the past loss from the date of decedent's death to the date of the report and the future loss, extending over decedent's normal life expectancy of 74 years up to the year 2053. Dr. Olson reduced his estimates to present value to determine the total loss.

The first category of loss may be described as financial support that decedent would have provided. In determining this loss, Dr. Olson first estimated decedent's earnings and benefits over a period of work expectancy, adjusted for probabilities of "non-work", to age 67. Dr. Olson provided two sets of estimates based on alternative methods of estimating decedent's future income. Dr. Olson then subtracted 85.09 percent of decedent's earnings, which amount decedent, as a single person, could be expected to have spent on

---

1. Because neither party has requested a hearing on this issue and because the court does not feel that a hearing would be helpful, the court has decided the matter based on the papers submitted.

his own personal consumption. The remaining 14.91 percent constituted the amount of loss, in this case estimated to be a total of either $125,070 or $146,578 in past and future loss of financial support, depending on the basis for computing future income.

Dr. Olson's second category of loss was for household services that decedent would have provided. Using a Cornell University study, Dr. Olson calculated the value of services provided by a single male based on 1.5 hours per day until age 40 and 1 hour per day thereafter. Dr. Olson thus estimated a total past and future loss for household services of $135,460.

The third category of loss estimated by Dr. Olson represents the "value of instruction, guidance, counsel and training" that decedent would have provided to his survivors over his lifetime. In his report, Dr. Olson describes this loss as follows:

> [Decedent] could have been expected to provide very valuable services as advisor, teacher, and counselor to his family. This has been lost because of his death. Although the contribution of [decedent] to his family is probably invaluable to the family, it is possible to determine an average monetary value for these services, based on what *society* pays persons for providing similar services.

To estimate the amount of this loss on an annual basis, Dr. Olson merely averaged the annual salaries of teachers, social workers, psychologists, and counselors, and projected that average forward at an average rate of growth. By this method, Dr. Olson estimated the total past and future loss in this category at $950,345.

## II. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*

Defendant bases its motion on the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In *Daubert*, the Supreme Court held that the admissibility of expert scientific testimony in federal trials is governed by Fed.R.Evid. 702, not by the *Frye* "general acceptance" test. *Id.* at 588, 113 S.Ct. at 2794. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed.R.Evid. 702. Under rule 702, the trial court must act as a gatekeeper and determine at the outset, pursuant to Fed.R.Evid. 104(a), "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592, 113 S.Ct. at 2796. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.*

The first prong of the inquiry, i.e., whether the subject of the testimony is "scientific knowledge", establishes a standard of evidentiary reliability, which requires that the proposed testimony be supported by appropriate scientific validation, or "good grounds" based on what is known. *Id.* at 590, 113 S.Ct. at 2795. The second prong, which requires that the testimony "assist the trier of fact to understand the evidence or to determine a fact in issue," goes primarily to relevance. *Id.* at 591, 113 S.Ct. at 2795. The question is one of "fit": Is the proffered expert testimony "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute?" *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir.1985), *quoted in Daubert*, 509 U.S. at 591, 113 S.Ct. at 2795.

The Supreme Court set out a nonexhaustive list of four factors that courts may consider in conducting its inquiry: (1) whether the theory or technique can be and has been tested; (2) "whether the theory or technique has been subjected to peer review and publication;" (3) "the known or potential rate of error;" and (4) general acceptance within the relevant scientific community. *Daubert*, 509 U.S. at 593–94, 113 S.Ct. at 2796–2797. In general, the rule 702 inquiry is a flexible one, whose focus "must be solely on principles and methodology, not on the conclusions

that they generate." *Id.* at 594–95, 113 S.Ct. at 2797–2798. Finally, a court should also consider the applicability of Fed.R.Evid. 403. *Id.* at 595, 113 S.Ct. at 2797.

■ The Tenth Circuit has noted that, after *Daubert*, the court has continued to apply a traditional rule 702 analysis "except in cases involving unique, untested, or controversial methodologies or techniques." *Compton v. Subaru of Am., Inc.*, 82 F.3d 1513, 1519 (10th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 611, 136 L.Ed.2d 536 (1996). The court stated that application of the four factors set out in *Daubert* "is unwarranted in cases where expert testimony is based solely on experience or training." *Id.* at 1518. Those factors should only be considered "if an expert witness offers testimony based upon a particular methodology or technique." *Id.* at 1519.

### III. Application of Rule 702 to the Proposed Testimony

■ In applying rule 702 to the present case, the court concludes that the loss figures generated by Dr. Olson, to the extent they extend beyond plaintiffs' life expectancies or fail to consider whether decedent would actually have given all possible support and services to his parents, are based on unjustified assumptions and therefore will not assist the trier of fact. The court further concludes that Dr. Olson's loss figures concerning loss of guidance or counsel are based on a methodology that is not sufficiently valid and also will not assist the trier of fact. Therefore, the court rules that Dr. Olson's proposed testimony concerning his opinions about the amounts of the losses sustained is inadmissible.[2]

The first flaw in Dr. Olson's calculations is his extension of each estimate over the course of decedent's entire life expectancy. Plaintiffs, who are decedent's parents, can only suffer damages over the course of their own life expectancies, which would no doubt be much shorter than decedent's. Dr. Olson explained in his deposition that he used decedent's life expectancy because he assumed

that decedent's younger siblings, who had longer life expectancies, were included among the survivors who would suffer loss from decedent's death. The siblings are not plaintiffs in this action, however, and, accordingly, their loss is irrelevant. Therefore, any total estimated loss calculations extending beyond plaintiffs' life expectancies are irrelevant; such totals as reflected in the report are inadmissible because they would not assist the jury in deciding an issue in the case, as required by rule 702.

The second flaw apparent in Dr. Olson's estimates of total loss also implicates all three categories of loss calculated in the report. As explained above, Dr. Olson estimated the total monetary loss to decedent's "survivors" for the loss of support and services that decedent would have provided. The problem with Dr. Olson's estimates is that they are not based on relevant assumptions. Without justification either in the evidence in the case or on any other rational basis, Dr. Olson's loss figures assume that plaintiffs would have been the sole recipients of the financial support and services of decedent, who was an unmarried 16–year–old male at the time of his death, over the course of his lifetime.

For example, Dr. Olson simply equates the 15 percent of decedent's income left over after decedent's own expenses with the amount of loss. While such an estimate may bear some relation to the loss actually suffered by decedent's potential "survivors", it is not relevant to the amount of loss suffered by plaintiffs specifically. Plaintiffs have presented no basis on which merely to assume that decedent would have given every available dollar to his parents over the course of their lives; in fact, a purely bare assumption along those lines would appear to be unreasonable. Dr. Olson's total does not take into account the likelihood that decedent would someday have had a wife and children on whom to bestow his largesse, or even that decedent would have put something away into savings. In the same way, there is no basis here to assume that decedent would

---

**2.** This does not mean that Dr. Olson will be precluded from testifying entirely, as discussed below.

have spent all of the time available to perform services doing so for the benefit of plaintiffs, his parents, and not at some juncture for the benefit of his own family, his siblings, or others.

Dr. Olson's figures would make much more sense as estimates of damages had the decedent been the head of a household and the plaintiffs been his spouse and children; in such event, one could perhaps reasonably assume that the plaintiffs were the beneficiaries of all of the decedent's support and services, and the amount of damages could be reasonably equated with the loss to the "survivors" as calculated by Dr. Olson. In this case, however, such equation is unjustified. The court thus concludes that the estimates of loss in Dr. Olson's report are inadmissible under rule 702 because they would not assist the jury in determining the amount of actual damages suffered by plaintiffs specifically. *See In re Aluminum Phosphide Antitrust Litig.*, 893 F.Supp. 1497, 1507 (D.Kan.1995) (proposed expert opinions based on unjustified assumptions would not assist the trier of fact and were therefore inadmissible under rule 702).

■ Moreover, the court concludes that the estimates should also be excluded on this basis under rule 403 because their minimal probative value would be substantially outweighed by the unfair prejudice and the confusion to the jury that would result from the authoritative rendering of such substantial damage estimates by an economic expert. *See id.* (excluding opinion testimony also under rule 403).

The fact that the estimates are based— without any evidentiary or even statistical support—on an assumption that decedent would not have married or had children also infects Dr. Olson's basic methodology. For instance, Dr. Olson relied on statistics showing that the average single male consumes 85 percent of his income and performs 1.5 hours and then 1 hour per week of household services. Estimates based on such statistics would not assist the jury, however, without some basis for the jury to conclude that decedent would have in fact remained single and without children throughout his parents' lifetime. Thus, Dr. Olson's estimates for fi-

nancial support and household services are inadmissible under rules 702 and 403 for that reason as well.

■ Defendant also objects to Dr. Olson's method of calculating the value of lost "instruction, guidance, counsel and training." To estimate that loss on an annual basis, Dr. Olson simply computed an average annual salary for teachers, social workers, psychologists, and counselors. Dr. Olson did not use any estimate of the amount of time decedent would actually have spent providing such services, as Dr. Olson did for household services. In his deposition, Dr. Olson explained his method as follows:

> Just as people provide physical services— like mowing the yard, taking care of the car, painting the house, all that sort of thing—people provide services as advisors, teachers, counselors to the family. And those have value. The main difference between these services and the physical services is that you don't have to provide them; they just have to be available in order to value them. And so what I have done is to value them very simply as the average [annual] wage for teachers, social workers, psychologists, and counselors ... for the availability of these services.

In short, Dr. Olson opines that plaintiffs have incurred pecuniary loss equivalent to having a full-time guidance counselor on their household staff in the event they should ever choose to call upon those services. Dr. Olson's method was based solely on his own article published in a 1996 book.

Because Dr. Olson's testimony on this issue would be based on a novel methodology, the court should consider the four *Daubert* factors here. *See Compton*, 82 F.3d at 1519. Those factors weigh strongly against the admissibility of testimony based on Dr. Olson's method of determining loss of guidance and counsel. Dr. Olson conceded in his deposition that his article was "theoretical" and that the method had not been subjected to any empirical research; thus, the method has not been tested and no potential error rate is known. *See Daubert*, 509 U.S. at 593–94, 113 S.Ct. at 2796–2797. Dr. Olson's theory has been published, but only by Dr. Olson him-

self a short time ago, and plaintiffs have not cited any positive peer review. *See id.* Finally, plaintiffs have not shown that there is a general acceptance of Dr. Olson's method in the economic community. *See id.* at 594, 113 S.Ct. at 2797.

Plaintiffs emphasize that the court's focus must be on the principles applied, not on the conclusions reached, *see id.* at 595, 113 S.Ct. at 2797, and they argue that sound principles were applied here. Plaintiffs insist that Dr. Olson's method for determining loss of guidance and counsel is identical to the well-accepted method he used to value the loss of household services.

The court concludes, however, that testimony based on Dr. Olson's method is not reliable or relevant precisely because the method is *not* like that employed for household services. The court agrees that a method whereby the value of services is determined by the market value for service providers is sufficiently valid. The court also acknowledges the method of estimating damages for loss of services whereby the value of the services is multiplied by the amount of time those services would actually have been provided to the plaintiffs, which method Dr. Olson purported to employ with regard to household services. These methods allow injured parties to fill the void left by death by being able to obtain from the marketplace substitute services reasonably likely to have been required by them.

For counsel and guidance, however, Dr. Olson does not deem it necessary to estimate and consider whether or how much those services would actually have been provided by decedent; rather, his approach values the *availability* of those services. In that respect, the estimates suffer from the second flaw discussed above with respect to financial support and household services. In this wrongful death action, plaintiffs may only recover their actual damages. *See* K.S.A. § 60–1901. Accordingly, any estimates of damages that include the value of services that plaintiffs might not have used would not assist the trier of fact in deciding the amount of damages plaintiffs actually suffered from decedent's death. Nor is Dr. Olson's method, which is fundamentally different from the generally accepted method of determining loss of household services and which has not been shown to have gained acceptance on its own in the economic community, economically valid. Therefore, the court concludes that testimony based on Dr. Olson's "24–hour–availability" method of calculating the loss of counsel and guidance is inadmissible under 702. The court further concludes that such testimony must also be excluded under a rule 403 analysis.

The court is not excluding Dr. Olson's testimony in its entirety. He is free to give his opinion about how much decedent would likely have earned during his parents' (not his) lifetime. Moreover, he is not precluded from testifying about statistical information underlying the opinions that the court has excluded. For example, assuming a proper economic basis, he may testify that the average single male spends a certain percentage of his income on his own consumption or performs household or other services with a certain frequency. Dr. Olson may also testify to the market value of such services generally, including the value of counseling services. He may not, however, give the opinions about total monetary losses that he has proffered. Neither may Dr. Olson offer the opinion at trial that it is appropriate to assume full-time availability as the basis to compensate plaintiffs for their loss.

## IV. Damages for Loss of Filial Guidance and Counsel

Defendant also argues that plaintiffs may not recover under Kansas law at all for the loss of their son's advice, counsel, training, guidance, or education. "[B]ecause the cause of action is purely a creature of statute, the only damages available in wrongful death actions are those expressly allowed by the wrongful death statute." *Smith v. Printup*, 254 Kan. 315, 333, 866 P.2d 985 (1993). Section 60–1904(a) of Kansas's wrongful death statute provides:

Damages may be recovered for, but are not limited to:

(1) Mental anguish, suffering or bereavement;

(2) loss of society, companionship, comfort or protection;

(3) loss of marital care, attention, advice or counsel;

(4) loss of filial care or attention;

(5) loss of parental care, training, guidance or education; and

(6) reasonable funeral expenses for the deceased.

K.S.A. § 60–1904(a).

Defendant argues that the legislature intended to exclude recovery for filial counsel or guidance by making such losses compensable in paragraphs (3) and (5) in the event of a deceased spouse or parent, but omitting such items in paragraph (4) relating to deceased children. Plaintiffs argue that they may recover such damages despite their absence from the list in section 60–1904(a) because the section states that compensable damages "are not limited to" the items listed.

No Kansas case has addressed the differences in the language used in paragraphs (3), (4), and (5). That language dates back to 1947, when the Kansas legislature amended the wrongful death statute. *See* 1947 Kan. Sess. Laws ch. 319, § 1 (codified as amended at Kan. Gen.Stat. § 60–3203 (1949)). Before 1947, only pecuniary damages were recoverable in wrongful death actions. *McCart v. Muir,* 230 Kan. 618, 628, 641 P.2d 384 (1982). "With the 1947 amendment came the allowance of both pecuniary and nonpecuniary losses under a statutory limit." *Id.* In 1975, the legislature amended the statute to make only nonpecuniary damages subject to the statutory cap. *See* 1975 Kan. Sess. Laws ch. 303, § 2; *Wentling v. Medical Anesthesia Servs., P.A.,* 237 Kan. 503, 507, 701 P.2d 939 (1985). The losses described in paragraphs (3) through (6) of section 60–1904(a) are considered pecuniary in nature. *See Wentling,* 237 Kan. at 508–09, 701 P.2d 939.

The court agrees that the Kansas legislature may well have intended something by using different words in describing parental, marital, and filial services in section 1904(a). In the absence of any specific indication that the legislature intended to exclude damages for loss of filial counsel or guidance, however, the court is unwilling to conclude that they are not recoverable in light of the plain language of the statute, which provides that recoverable damages are not limited to those losses listed in the succeeding paragraphs. *Cf. Smith,* 254 Kan. at 333–34, 866 P.2d 985 ("not limited to" language does not permit punitive damages in light of other provisions in the wrongful death act that make clear that only compensatory damages are recoverable).

Moreover, the court notes that financial support and household services are also absent from the losses listed in section 1904(a), although pecuniary damages for such losses have been permitted in wrongful death actions throughout this century. *See* Mark A. Buck, Note, *Damages for Wrongful Death in Kansas: Some Problems, Questions and Answers,* 17 Washburn L.J. 88–91 (1977).

The court concludes that pecuniary damages for loss of filial guidance, counsel, and similar services are not excluded by section 60–1904(a) of the wrongful death statute.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion in limine to exclude testimony by Dr. Olson (Doc. 51) is sustained in part and overruled in part. Dr. Olson's testimony is limited in accordance with this opinion.

**IT IS SO ORDERED.**